## In re BROWNING–FERRIS INDUSTRIES INC. SECURITIES LITIGATION.

### Civ. A. No. H–90–3447.

United States District Court,
S.D. Texas,
Houston Division.

Jan. 26, 1995.

Bruce K. Cohen, Meredith & Cohen, Philadelphia, PA, Mark L.D. Wawro, Susman & Godfrey, Houston, TX, for plaintiffs Leonard Eisner Profit Sharing Plan, John McNamara, Albert Lichtman, Arnold Malakoff, Jane Malakoff, Northwoods Office Services Defined Benefit Pensions Plan.

Bruce K. Cohen, Meredith & Cohen, Philadelphia, PA, for plaintiffs Herbert A. Krumbein, Norman, Ira Shapiro, Dorothy Lordo, L. Trustee Uchitel, J. Trustee Kaliser, Lloyd Kaufman.

Harvey Greenfield, James, New York City, Theodore C. Anderson, Kilgore & Kilgore, Dallas, TX, for plaintiff Jerry Krim.

Mel E. Lifshitz, Bernstein Liebhard & Lifshitz, New York, for plaintiffs Gila Dekel, Emile Dekel.

Curtis V. Trinko, New York City, for plaintiff Benjamin Ileto.

Daniel M. McClure, Fulbright & Jaworski, David J. Beck, Beck Redden & Secrest, Houston, TX, for defendants Browning Ferris Indus. Inc., William D. Ruckelshaus, David R. Hopkins, Fletcher Thorne Thomsen, John E. Drury.

Joseph Eugene Clements, Clements O'Neill & Pierce, Houston, TX, for defendant John R. Stanton.

Samuel J. Buffone, Jr., Ropes & Gray, Washington, DC, for defendant Howard S. Hoover, Jr.

Daniel M. McClure, Fulbright & Jaworski, Houston, TX, for defendant Harry J. Phillips, Sr.

## MEMORANDUM AND ORDER

ROSENTHAL, District Judge.

Pending before this court are Joint Motions for Summary Judgment filed by defendants Browning–Ferris Industries, Inc. ("BFI"), John E. Drury ("Drury"), David R. Hopkins ("Hopkins"), Harry J. Phillips ("Phillips"), William D. Ruckelshaus ("Ruckelshaus"), Fletcher Thorne–Thomsen, Jr. ("Thorne–Thomsen"), John Stanton, Jr. ("Stanton"), and Howard S. Hoover, Jr. ("Hoover"). (Docket No. 104 and 115). Also pending before this court are Motions for Summary Judgment filed by defendant Stanton (Docket Entry No. 106) and defendant Hoover (Docket Entry No. 107). After careful consideration of the facts, the parties' submissions, and the applicable authority, this court GRANTS the joint motions as to the first and second class periods. The motions filed by defendants Hoover and Stanton are deferred, for the reasons set out below.

## I. Background

### A. The First Class Period

BFI is a publicly traded company in the waste collection and treatment business.

During a forty-eight hour period in November 1990, the market price of BFI's stock dropped 28 percent, from $30.25 per share on November 5, 1990, to $21.75 per share on November 7, 1990. (Docket Entry No. 129, Ex. 64). On November 6, 1990, a BFI press release announced income from continuing operations for its 1990 fiscal year ended September 30, 1990 of $256,786,000, or $1.68 per share. This included fourth quarter special charges of $67 million. In the prior fiscal year, BFI had net income from continuing operations of $278,065,000, or $1.84 per share. (Docket Entry No. 117, Ex. M).

In April 1990, BFI had taken a $295,000,000 charge for discontinued operations. This charge occurred before the beginning of the first class period, and is not challenged here. The combination of the fourth quarter 1990 operating results and special charges, with the earlier charge for discontinued operations, led to a net loss of $44,743,000, or $.29 per share, for the 1990 fiscal year. This compared with fiscal year 1989 results of $262,555,000 net income, or $1.74 per share.

A major factor in the fourth quarter 1990 results was the $67 million in one-time special charges. BFI had agreed to a $30.5 million proposed settlement of an antitrust suit (the "Cumberland Farms litigation") in October 1990. (Docket Entry No. 121, Ex. 1, at 47). BFI also took a charge against income of $25 million, primarily consisting of additional reserves for the unsuccessful Flying Cloud Sanitary landfill ("FCSL"). (Docket Entry No. 117, Ex. 1, ¶ 19).

The first plaintiffs filed suit on November 7, 1990, one day after the press release. The present action consolidated several individually filed suits. Plaintiffs, representing a class of investors who purchased BFI stock from August 9, 1990 through November 6, 1990, alleged securities fraud under sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b–5, 17 C.F.R. § 240.10b–5 (1993). Plaintiffs also claimed that defendants committed common law fraud, negligent misrepresentation, and violated section 27.01 of the Texas Business and Commerce Code (Vernon 1987).

Plaintiffs' allegations concerning the first class period fall into three general categories. First, plaintiffs contend that BFI made projections about growth in revenues and earnings before the first class period began that were material misrepresentations. Plaintiffs claim that these projections remained alive during the class period and required correction. Plaintiffs specifically challenge statements in the 1989 Form 10–K and Annual Report, and statements by Chairman and Chief Executive Officer William Ruckelshaus in March and April 1990.

Second, plaintiffs allege that BFI should have disclosed reserves for the Cumberland Farms antitrust litigation and the Flying Cloud Sanitary Landfill in the August 1990 third quarter Form 10–Q.

Finally, plaintiffs allege that statements in the third quarter Form 10–Q and two statements made by defendant Thorne–Thomsen in September 1990 were false and misleading.

### B. The Second Class Period

On September 3, 1991, BFI released a Form 8–K, revising its recently issued third quarter 1991 projection for the fourth quarter and year-end downward. BFI's stock price dropped approximately 16 percent, from a closing price of $25.75 on August 30, 1991, to $21.75 on September 3, 1991. Plaintiffs amended their complaint on October 8, 1991 to allege continuing securities violations from November 6, 1990 to September 3, 1991.

Plaintiffs allege eight specific instances in which BFI's late 1990 and 1991 public disclosures violated the securities laws: (1) the press release of November 6, 1990; (2) the fiscal year 1990 Form 10–K, dated December 14, 1990; (3) the 1990 Annual Report dated January 23, 1991; (4) a Reuter's dispatch dated February 6, 1991; (5) the 1991 first quarter Form 10–Q dated February 12, 1991; (6) the 1991 second quarter Form 10–Q dated May 7, 1991; (7) the press release dated June 27, 1991; and (8) the 1991 third quarter Form 10–Q dated August 12, 1991.

Plaintiffs assert that BFI's fiscal year 1991 projections were fraudulently intended to

mislead investors into believing that the 1990 problems had been addressed when, in fact, they were much more serious than BFI disclosed. Plaintiffs point to the progressive decline in BFI's fiscal 1991 performance; BFI's actual year-end results; and the fact that some individual defendants sold BFI stock during this period, to support their claim that defendants made these misrepresentations with the required *scienter*.

## C. The Individual Defendants

Plaintiffs named as individual defendants the following officers and directors of BFI:

| NAME | TITLE |
| --- | --- |
| John E. Drury | President from 1982 to 1990 |
| David R. Hopkins | Controller and Chief Accounting Officer |
| Harry J. Phillips | Chairman of the Executive Committee of the Board of Directors since 1988. |
| William D. Ruckelshaus | Chairman, Chief Executive Officer, and a Director |
| Fletcher Thorne–Thomsen, Jr. | Vice President, Investor Relations |
| R. John Stanton | Chief Financial Officer, Vice–President, and a Director |
| Howard S. Hoover, Jr. | General Counsel |

Plaintiffs assert that the individual defendants are liable based on aiding and abetting under section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and as control persons under section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Plaintiffs also assert that certain of the individual defendants are liable for insider trading under section 10(b) and Rule 10b–5.

After extensive discovery, all defendants have moved for summary judgment as to each element of the federal securities law claims for both class periods.

## II. Standard for Summary Judgment

■ Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. Under Fed. R.Civ.P. 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue for trial." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Leonard v. Dixie Well Serv. & Supply, Inc.*, 828 F.2d 291, 294 (5th Cir.1987). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. A fact is "material" if its resolution in favor of one party might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

When the moving party has met its Rule 56(c) burden, the nonmovant cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 199 (5th Cir.1988). The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts ... [T]he nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1356 (quoting Fed.R.Civ.P. 56(e)) (emphasis in original); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Leonard*, 828 F.2d at 294.

■ In deciding a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513. If the evidence rebutting the motion for summary judgment is only colorable or not significantly probative, summary judgment should be granted. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511; *see Lewis v. Glendel Drilling Co.*, 898 F.2d 1083, 1088 (5th Cir.1990), *cert. denied*, 502 U.S. 857, 112 S.Ct. 171, 116

L.Ed.2d 134 (1991). If reasonable minds can differ regarding a genuine issue of material fact, summary judgment should not be granted. *Anderson,* 477 U.S. at 250–51, 106 S.Ct. at 2511.

### III. The Elements of Securities Fraud under Section 10(b) and Rule 10b–5

Section 10(b) prohibits any person from using or employing any "manipulative or deceptive device" in connection with the sale of a security. Rule 10b–5 forbids the making of "any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

Under section 10(b) or Rule 10b–5, a plaintiff must prove: (1) a misstatement or omission; (2) of a material fact; (3) occurring in connection with the purchase or sale of a security; (4) that was made with scienter; (5) upon which the plaintiff justifiably relied; and (6) that proximately caused injury to the plaintiff. *Rubinstein v. Collins,* 20 F.3d 160, 166 (5th Cir.1994). The court may grant summary judgment for defendants if the plaintiffs' summary judgment evidence fails to raise a genuine issue of material fact as to any one of those elements. *Fine v. American Solar King Corp.,* 919 F.2d 290 (5th Cir.1990), *cert. dismissed, Hurdman v. Fine,* 502 U.S. 976, 112 S.Ct. 576, 116 L.Ed.2d 601 (1991).

### A. Predictive Statements and the "Bespeaks Caution" Doctrine

■ Rule 10b–5 can apply to predictive statements. In *Rubinstein,* 20 F.3d at 166, the Fifth Circuit reaffirmed the following statement from *Isquith v. Middle South Util.,* 847 F.2d 186, 203 (5th Cir.1988):

[W]hen necessary, courts have readily conceded that predictions may be regarded as "facts" within the meaning of the antifraud provisions of the securities laws.... Most often, whether liability is imposed depends on whether the predictive statement was "false" when made. The answer to this inquiry, however, does not turn on whether the prediction in fact proved to be wrong; instead, falsity is determined by examining the nature of the prediction—with emphasis on whether the prediction suggested reliability, bespoke caution, was made in good faith, or had a sound factual or historical basis.

*Rubinstein,* 20 F.3d at 166, *quoting Isquith,* 847 F.2d at 203–204. A forecast or prediction may be regarded as a "fact" within the meaning of the securities laws if: (1) the speaker did not genuinely believe the statement was true; (2) there was no reasonable basis for the speaker to believe the statement was true; and (3) the speaker was aware of an undisclosed fact tending seriously to undermine the accuracy of the statement. *Rubinstein v. Collins,* 20 F.3d at 166.

■ A court must determine whether a challenged statement is a forecast or prediction, as opposed to a "soft" statement that generally lacks materiality because "the market price of a share is not inflated by vague statements predicting growth." *Raab v. General Physics Corp.,* 4 F.3d 286, 289 (4th Cir.1993). As the Fifth Circuit has recently affirmed, "projections of future performance not worded as guarantees are generally not actionable under the federal securities laws." *Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1446 (5th Cir.1993).

■ In determining whether a predictive statement "suggested reliability, bespoke caution, was made in good faith, or had a sound factual or historical basis," a court must examine the context in which the statement is made. As the Fifth Circuit recently stated:

[m]ateriality is not judged in the abstract, but in light of the surrounding circumstances. The appropriate inquiry is whether, under all the circumstances, the omitted fact or the prediction without a reasonable basis "is one [that] a reasonable investor would consider significant in [making] the decision to invest, such that it alters the total mix of information available about the proposed investment." Inclusion of cautionary language—along with disclosure of any firm-specific adverse facts or assumptions—is, of course, relevant to the materiality inquiry, for such inclusion or

disclosure is part of the "total mix of information."

*Rubinstein,* 20 F.3d at 168; *see also Krim v. BancTexas Group,* 989 F.2d at 1448–49; *In re Trump Securities Litigation,* 7 F.3d 357, 377 (3d Cir.1993), *cert. denied, Gollomp v. Trump,* —— U.S. ——, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994).

The courts have recently reaffirmed the "bespeaks caution" doctrine in cases involving predictive statements. At least seven circuits have adopted some form of the doctrine. *See In re: Worlds of Wonder Securities Litigation,* 35 F.3d 1407, 1414 (9th Cir. 1994); *Rubinstein v. Collins,* 20 F.3d 160, 166–68 (5th Cir.1994); *Kaufman v. Trump's Castle Funding (In re Donald J. Trump Casino Sec. Litig.),* 7 F.3d 357, 371–73 (3d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994); *Moorhead v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 949 F.2d 243, 245–46 (8th Cir. 1991); *Sinay v. Lamson & Sessions Co.,* 948 F.2d 1037, 1040 (6th Cir.1991); *I. Meyer Pincus & Assocs. v. Oppenheimer & Co.,* 936 F.2d 759, 763 (2d Cir.1991); *Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 879 (1st Cir.1991). As the Fifth Circuit held in *Rubinstein:*

> The "bespeaks caution" doctrine ... reflects a relatively recent, ongoing, and somewhat uncertain evolution in securities law, an evolution driven by the increase in the unique nature of fraud actions based on predictive statements. In essence, predictive statements are just what the name implies: predictions. As such, any optimistic projections contained in such statements are necessarily contingent. Thus, the "bespeaks caution" doctrine has developed to address situations in which optimistic projections are coupled with cautionary language—in particular, relevant specific facts or assumptions—affecting the reasonableness of reliance on the materiality of those projections. To put it another way, the "bespeaks caution" doctrine reflects the unremarkable proposition that statements must be analyzed in context.

*Rubinstein,* 20 F.3d at 167 (footnotes omitted).

## B. Insider Trading

■ The "disclose or abstain" rule can give rise to liability under section 10(b) and Rule 10b–5 when corporate insiders trade on the basis of material non-public information. Corporate insiders wishing to trade must either disclose the information or wait until it has been disclosed in the natural course of events before trading. *See, e.g., In re Zenith Laboratories Sec. Litig.,* No. 86–3241A, 1993 WL 260683 at *7 (D.N.J. Feb. 11, 1993) ("A duty to disclose exists only under certain limited circumstances. One such circumstance is when a corporate insider has used material nonpublic information to profit in the securities markets. Directors, officers, and principal shareholders all qualify as corporate insiders under section 10(b), as long as they 'have obtained confidential information by reason of their position with that corporation.'") (citations omitted)); *In re Cady Roberts & Co.,* 40 S.E.C. 907 (1961); *In re Compaq Securities Litigation,* 848 F.Supp. 1307, 1310 (S.D.Tex.1993).[1]

## IV. Summary Chart of the Disclosures Challenged as to the First Class Period

| 12/2/89 | Fiscal 1989 Form 10–K | | |
|---|---|---|---|
| | Revenues | $2,550,592,000 | 23% over prior year |
| | Income from Operations | $ 465,009,000 | 21% over prior year |
| Statement: | "The Company believes that its revenue growth trend over the past five years will continue through fiscal 1990 and beyond." | | |

---

**1.** The court in *In re Compaq Securities* observed that the "[p]laintiffs apparently included this [the insider trading] allegation in an attempt to avoid the possibility that the trading Control Person Defendants could escape liability as "controlling persons" under Section 20(a) because they had no independent duty to disclose." 848 F.Supp. at 1310. That observation applies to this case as well.

| 1/24/90 | **Press Release** announcing first quarter fiscal 1990 results | | |
| --- | --- | --- | --- |
| | Revenues | $715,451,000 | 22% over prior year |
| | Income from Operations | $125,383,000 | 21% over prior year |

**2/7/90** **First Quarter 1990 Form 10–Q** (for three months ended 12/31/90)

**3/11/90** **Ruckelshaus statement:** "The company's growth prospects are just as attractive today as they have been in the last few years, and I don't see any near term diminishment of that ∴ ."

**4/5/90** **Ruckelshaus statement:** "[T]he future prospects of our solid waste collection and disposal business are extremely attractive."

| 4/23/90 | **Press release** announcing second quarter fiscal 1990 results | | |
| --- | --- | --- | --- |
| | Revenues | $708,475,000 | 21% over prior year |
| | Income from Operations | $134,886,000 | 22% over prior year |
| | Income from Continuing Operations | $71,921,000 | 14% over prior year[2] |

**5/4/90** **Second Quarter 1990 Form 10–Q** issued (for six months ended 3/31/90)

| 7/19/90 | **Press release** announcing third quarter fiscal 1990 results | | |
| --- | --- | --- | --- |
| | Revenues | $767,562,000 | 18% over prior year |
| | Income from Operations | $152,400,000 | 15% over prior year |
| | Income from Continuing Operations | $ 82,378,000 | 9% over prior year |

**8/9/90** **First Class Period Begins. Third Quarter Form 10–Q** issued (for nine months ended 6/30/90)

**Statement:** BFI does not believe that the Cumberland Farms litigation poses "a material risk of having a materially adverse effect on the Company's business."

**9/12/90** **News services report** that Thorne–Thomsen is "comfortable" with analysts' fiscal year earnings estimates of $1.99–$2.00 per share.

**9/26/90** **Thorne–Thomsen states** that BFI's business "has some recession resistant characteristics. . . . We are not dependent on any particular part of the country," and that he has "no quarrel" with analysts' fiscal 1990 earnings estimates.

| 11/6/90 | **First Class Period ends. BFI press release** announces fiscal 1990 results | | |
| --- | --- | --- | --- |
| | Revenues | $2,967,459,000 | 19% over prior year |
| | Income from Operations | $ 490,684,000 | 0.4% over prior year |
| | Income from Continuing Operations | $ 256,786,000 | −8% from prior year |

---

## V. The Pre–Class Period Statements and the Duty to Correct

### A. Plaintiffs' Claim that BFI "Guaranteed" Annual Growth Rates for Revenue and Net Earnings

On December 2, 1989, eight months before the first class period began, BFI made the following statement in the 1989 Form 10–K for the fiscal year ended September 30, 1989:

> The Company believes that its revenue growth trend over the past few years will continue through fiscal 1990 and beyond. However, the Company anticipates that net income may only grow at about the same pace during fiscal 1990 based on assumptions relating principally to the continuation of losses in the chemical waste segment, an increase in the effective income tax rate and interest expense associated with recent acquisitions and development projects.

(Docket Entry No. 117, Ex. C, p. 28; Ex. D, p. 27). The 1989 Annual Report to Shareholders included the same language.

Plaintiffs claim that this statement fraudulently "assured" investors that in fiscal year 1990, BFI would continue its historical annual growth rate for revenues (approximately 25 percent) and for earnings (approximately 15 percent). Plaintiffs assert that this "as-

2. BFI announced its withdrawal from the hazardous waste aspects of its business and distinguished between discontinued and continuing operations after this point.

surance" remained "alive" during the first class period and required correction when adverse developments occurred.

### 1. There Was No Assurance or Guaranty

The Fifth Circuit has recently affirmed that projections of future performance, not worded as guarantees, are generally not actionable under the federal securities laws. *Krim v. BancTexas Group*, 989 F.2d at 1446; *see also Raab v. General Physics Corp.*, 4 F.3d at 290. In *Krim*, the court held that a statement by company management, that "[t]he Company is hopeful, although there can be no assurance, that the successful implementation of the Restructuring Plan will resolve its current financial problems,...." was not actionable. *Krim*, 989 F.2d at 1447. The Fourth Circuit held in *Raab* that statements in an annual report that "[r]egulatory changes ... have created a marketplace for the DOE Services Group with an expected annual growth rate of 10 percent to 30 percent over the next several years" and that "the DOE Services Group is poised to carry the growth and success of 1991 well into the future" were not actionable. *Raab*, 4 F.3d at 289. Such statements of management's opinion or hopes for future performance generally lack materiality as a matter of law because the market is not affected by such statements. *Id.*

An examination of the context in which the challenged statement appears strengthens the conclusion that it was not a "guarantee" or "assurance." The challenged language appears in a section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations." The context bears reprinting:

> Consolidated revenues for fiscal 1989 were $2,551 million, a 23% increase over the prior year. Net income and earnings per share increased 16% and 15% respectively, over fiscal 1988. The increase in revenues was due principally to the strong operating performance in the solid waste businesses and the impact of the Company's acquisition and market development programs. Although revenues increased significantly over fiscal 1989, net income growth was impacted negatively by losses in the chemical waste segment, increased levels of interest expense associated with acquisitions and an increase in the effective income tax rate. *The Company believes that its revenue growth trend over the past few years will continue through fiscal 1990 and beyond. However, the Company anticipates that net income may only grow at about the same pace during fiscal 1990 based on assumptions relating principally to the continuation of losses in the chemical waste segment, an increase in the effective income tax rate and interest expense associated with recent acquisitions and development projects.*

(Docket Entry No. 117, Ex. C, at 28; Ex. D, p. 36) (emphasis added).

The same section of the 1989 Form 10–K also reviewed operating costs. This discussion is relevant to plaintiffs' claim that BFI falsely and unreasonably projected a continuation of the historical net income growth trend. The Form 10–K stated as follows:

> During fiscal years 1989, 1988, and 1987, cost of operations increased $323 million (25%) $270 million (26%) and $200 million (24%) respectively. As a percent of revenues, the cost of operations for each of the three fiscal years 1989, 1988 and 1987 was 63.9% 63.2% and 62.6% respectively. Operating expenses during each of the three fiscal years were heavily influenced by higher landfill disposal related costs. Disposal costs, which are the largest single component of operating expense, rose over 20% in fiscal 1989 and in excess of 30% for each of the two previous fiscal years. Other operating costs increased as a percent of revenues during fiscal 1989, principally as a result of increased operating costs in the chemical segment and in the Company's international operations which expanded significantly during fiscal 1989. Other operating costs declined as a percent of revenues in the previous two fiscal years due to operating efficiencies and the continued emphasis on controlling variable operating expenses. The overall impact of the higher disposal and other operating costs caused a slight decline in the gross profit margin in fiscal 1989 from the prior

years. The Company believes that disposal cost increases, which are largely attributable to the increasing scarcity of landfill airspace as well as the higher costs associated with environmental compliance, disposal site upgrading and landfill closure and post closure, will continue in future years. Management believes these increased costs can be recovered through increased prices thereby maintaining operating profits, although operating margins may continue to decline.

(Docket Entry No. 117, Ex. C. p. 29).

Like the statements in *Raab* and *Krim*, the opinion by BFI management as to BFI's future rates of growth was not a guarantee or assurance that these rates would be achieved. It was a statement of opinion, made in the context of disclosures about operating costs and other company-specific factors impacting income. No reasonable investor would have viewed the statements as to BFI's anticipated rates of growth as a "guaranty" or "assurance" that specific levels of growth would be, in fact, reached.

### 2. "Bespeaks Caution"

To determine the materiality of a statement coupled with cautionary language, a court must examine the statement and its context. *Rubinstein,* 20 F.3d at 168; *Krim,* 989 F.2d at 1446; *Isquith,* 847 F.2d at 208.

BFI's forward-looking statement as to future growth rates for net income and revenues was made in the context of disclosures of industry-specific and company-specific negative factors that could affect BFI's revenues and earnings growth. BFI discussed in detail the increase in operating costs from fiscal years 1987 to 1989 and listed specific factors supporting management's belief that such costs would continue to rise.

BFI's challenged statement was coupled with relevant specific facts and assumptions about the factors affecting BFI's costs and revenues. BFI's statement "bespeaks caution" under the applicable authorities. *See, e.g., Rubinstein,* 20 F.3d at 168; *In re Trump Casino Securities Litigation,* 7 F.3d 357, 369–73 (3rd Cir.1993); *Romani v. Shearson Lehman Hutton,* 929 F.2d at 879–80.

### 3. A Duty to Correct During the First Class Period

Plaintiffs also contend that the statement that the historical revenue growth trend "over the past few years will continue through fiscal 1990 and beyond," and that "income may only grow at about the same pace as fiscal 1990," made eight months before the class period began, "remained alive" until and during the class period and should have been corrected in light of adverse actual results.

"[I]f a corporation voluntarily makes a public statement that is correct when issued, it has a duty to update that statement if it becomes materially misleading in light of subsequent events." *Greenfield v. Hueblein, Inc.,* 742 F.2d 751, 758 (3rd Cir.1984), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1189, 84 L.Ed.2d 336 (1985). This principle applies to projections as well as other public statements. *Kirby v. Cullinet Software, Inc.,* 721 F.Supp. 1444, 1450 (D.Mass.1989); *In re: Kulicke & Soffa Industries,* 697 F.Supp. 183, 185 (E.D.Pa.1988). However, a projection must become misleading as to a material matter to require later correction. *Basic Inc. v. Levinson,* 485 U.S. 224, 236–39, 108 S.Ct. 978, 986–87, 99 L.Ed.2d 194 (1988).

During the first three quarters of fiscal year 1990, BFI published quantitative comparisons between the current and prior years' revenues, costs, and income. The publications included the first quarter Form 10–Q filed February 9, 1990; a press release dated April 23, 1990, with a consolidated statement of operations for the three months and six months ended March 31, 1990; the second quarter Form 10–Q dated May 4, 1990; a press release dated July 19, 1990, announcing third quarter and nine-month financial results; and the third quarter Form 10–Q filed August 9, 1990.

The Forms 10–Q for the first, second, and third quarters of fiscal year 1990 contained detailed analyses of actual revenues, actual operating costs, and net income. The reported numbers showed a continuation in the multi-year upward trend of operating costs reported in the 1989 Form 10–K. BFI in-

cluded in each of its fiscal 1990 Form 10–Q's "certain ratios (shown as a percent of revenues) which reflect profitability trends of the Company and the Company's ratio of earnings to fixed charges." (Docket Entry No. 159, Tab 4, p. 10; Tab 6, p. 11; Tab 8, p. 10). Throughout 1990, BFI published detailed information about BFI's actual trends in income, revenues, costs, and "profitability."

Plaintiffs argue that "BFI's [fiscal 1990] internal monthly operating statements warned Defendants that forecasting a continuation of historical growth trends" would be false and misleading because BFI's year-to-date EBINT [Earnings Before Interest, National Overhead, and Taxes] growth (1) "had slowed to 13% through April"; (2) was "only 11% above the prior year" through May; (3) "June operating results reflected the same growth rate"; and (4) "July's operating results reflected a further slowdown in the rate of growth to 16%." (Docket Entry No. 128, p. 9).[3] However, plaintiffs have not provided any competent summary judgment evidence that the "forecasts" in the 1989 Form 10–K "remained alive" during the first class period so as to become misleading as to a material matter eight months later, or require "correction."

BFI has provided summary judgment evidence that throughout fiscal year 1990, BFI published its actual rates of earnings growth, actual revenues and costs, and "profitability trends." These disclosures became part of the "total mix" of information available before and during the first class period. This factual information, issued beginning on January 24, 1990 and continuing throughout the first class period, superseded BFI's statements of anticipated growth rates made in December 1989 and January 1990, in the 1989 Form 10–K and Annual Report. *See TSC Ind. v. Northway, Inc.,* 426 U.S. 438, 448–49, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). These statements did not remain

alive during the class period and therefore did not require correction.

**B. Plaintiffs' claim that BFI's 1989 Form 10–K created a false and misleading impression that BFI's operations would not be materially affected by local economic conditions**

Plaintiffs allege that the 1989 Form 10–K created the misleading impression that BFI would not be materially affected by local economic conditions and that the waste disposal business was not price sensitive. Plaintiffs claim that BFI created this misimpression by stating that "no single customer or district accounts for a material amount of BFI's revenue or net income," and that "some Northeastern and Mid–Atlantic states are currently experiencing a critical shortage of suitable solid waste disposal facilities."

Defendants have presented competent summary judgment evidence that in 1989, BFI had more than 315 operating districts in North America. (Docket Entry No. 117, Ex. C, p. 2). Plaintiffs have not provided summary judgment evidence to raise a disputed issue that any single customer or district did in fact account for a material amount of BFI's revenue or net income. There is no basis for finding that the statement was false.

There is similarly no basis for finding that this statement created a "misleading impression" that BFI would be unaffected by local economic conditions and that its waste disposal business was not price sensitive. Plaintiffs ask this court to jump from BFI's true statement that no one district or customer accounted for a material amount of BFI's income or revenue to a "false assurance" that BFI was able to raise prices with impunity. There is no basis for this jump.

BFI's statement that "some Northeastern and Mid–Atlantic states are currently experiencing a critical shortage of suitable solid

---

**3.** The first quarter Form 10–Q announced that actual revenues had increased 23 percent over first quarter 1989; net income from continuing operations was up 11.5 percent, and costs of operations were up 24 percent. The second quarter Form 10–Q showed a 21 percent increase in revenues; a 14 percent increase in net income from continuing operations; and a 25 percent increase in costs of operations. The third quarter Form 10–Q reported an 18 percent increase in revenues; an 8.8 percent increase in net income from continuing operations, and a 21.7 percent increase in costs of operations.

waste disposal facilities," does not foster a misleading impression of immunity from local economic conditions. This statement was made in a section of the 1989 Form 10–K entitled "Waste Disposal Risk Factors." The context in which the challenged statement appeared was as follows:

There are serious, often unforeseeable, business risks and potentially substantial cost exposures associated with the establishment, ownership and operation of solid waste sanitary landfill sites and other types of waste processing and disposal facilities. These risk factors include, but are not limited to: (i) an increasing shortage of disposal capacity in some parts of the United States, coupled with the difficulty of obtaining permits to expand or establish new sites and facilities and public and private opposition to the location, expansion and operation of these facilities ...

If the Company were unable to continue using or disposing of planned volumes of wastes at existing solid waste landfills and unable to either expand existing landfills or establish new sites, it would be required to obtain the rights to use other disposal facilities or to suspend or curtail solid waste collection or disposal activities. If this were to occur on a widespread basis, together with the expenses and risks referred to above, it could substantially reduce certain revenues and increase the risk of impairing the value of the investment in these facilities. These developments could also result in the acceleration of closure costs and post-closure monitoring cost accruals for those landfills, with a corresponding negative impact on net income.

Some Northeastern and Mid–Atlantic states are currently experiencing a critical shortage of suitable solid waste disposal facilities. Unless additional disposal capacity is developed, many private and governmental solid waste collection companies operating in the affected areas, including BFI, could be required to curtail or even suspend those operations.

(Docket Entry No. 117, Tab C, pp. 4–5).

Instead of creating or reinforcing an impression that BFI's revenues would not be affected, the statement about shortages in landfill space in the Northeast was a *warning* of possible future declines in revenues. The statement described a situation that could have a *negative* impact on BFI's revenues and net earnings. There is no fact issue that the statement, taken in context, fostered a "false impression" that BFI's waste disposal business was immune from adverse local economic conditions.

## C. Ruckelshaus's Statement to Investors on March 11, 1990

On March 11, 1990, Ruckelshaus, BFI's Chairman and Chief Executive Officer, made the following statement during a meeting with between ten and fifteen investors:

Our growth, as you know, has historically been fueled by a combination of increasing our customer base, increasing the value of our activities, increasing our prices on an annual basis, and through what we call market development or the acquisition of new companies, additional companies or through national contracts. This combination has historically led to a growth of something between 17 and 25% and we don't see any diminishment in that growth path ...

[T]he company's growth prospects are just as attractive today as they have been in the last few years, and I don't see any near term diminishment of that....

(Docket Entry No. 129, Ex. 47).

Plaintiffs contend that this statement needed correction during the class period because it: (1) contradicted an internal memorandum dated October 1989 to Bruce Ranck, BFI Executive Vice–President for Solid Waste Operations–North America, from BFI President John Drury, noting the "seriousness of the current earnings situation"; (2) contradicted a BFI internal study dated January 1990, stating that BFI's ratio of new customers to lost customers was one to one; (3) was contradicted by an internal study dated March 21, 1990, stating that annualized margins had "declined significantly in recent years," and that EBINT growth had declined from 16.7 percent in 1986 to 2.8 percent in 1989; (4) was contradicted by an April 1990 memo from Stanton noting con-

cern over a "serious problem with a declining earnings growth rate"; and (5) was contradicted by an April 1990 senior management group memo identifying a decline in real annual growth, a "record pace" in losing customers, and a resulting inability to raise prices.

Plaintiffs argue that these internal company documents made Ruckelshaus's March 1990 prediction that historic growth trends would continue false and in need of correction during the class period. (Docket Entry No. 160, pp. 6–8).[4]

█ The January 1990 internal BFI study, showing a one-to-one ratio of new to lost customers in the North American solid waste business, does not create a fact issue that Ruckelshaus's March 11, 1990 statement was false or unreasonable so as to require correction during the first class period. The study stated that: "[t]he major point is that 1989 revenue growth (September to September) for North American Solid Waste was only 15 percent, well below our historical trend and expectations. A similar first quarter 1990 to 1989 showed only 16 percent growth." (Docket Entry No. 121, Ex. 2, BFI029–00005). First, the internal study referred only to North American waste solid waste collection activities, not to BFI's operations as a whole. Second, after this study and before Ruckelshaus's statement, BFI issued its first quarter 1990 actual results, published on February 9, 1990. This Form 10–Q disclosed both a 23 percent increase in revenues over the first quarter of 1989 for BFI as a whole, *and* a 24 percent increase in the cost of operations.

BFI's second and third quarter Form 10–Qs, also published after Ruckelshaus's statement, contained specific, quantitative data showing actual rates of growth in both revenues and costs, and comparisons with the prior year. The information about increasing revenues, increasing costs, and declining earnings, disclosed *after* Ruckelshaus's statements, provided current, factual information about operating results and trends before and during the first class period.

This court does not find that Ruckelshaus made a projection of future revenues or earnings by stating on March 11, 1990 that "[t]he company's growth prospects are just as attractive today as they have been in the last few years, and I don't see any near term diminishment of that." This court merely points out that, even if the statement is characterized as a projection, it was superseded by the specific disclosures that occurred before the first class period began in August 1990. There was no duty to correct the statement during the first class period.

**D. Ruckelshaus's April 5, 1990 Statement**

█ Plaintiffs also assert that Ruckelshaus's April 5, 1990 statement that "the future prospects of our solid waste collection and disposal business are extremely attractive," was materially misleading.

The statement was made as part of Ruckelshaus's disclosure that BFI was withdrawing from the hazardous waste business. Ruckelshaus stated:

> While we are confident that the substantial investments we have made in people and capital to get CECOS back on track would have eventually paid off, we feel that our resources are better directed in the future toward developing opportunities in our core solid waste business.

> The future prospects of our core solid waste collection and disposal business are extremely attractive. Recycling, medical waste collection and disposal, industrial solid waste disposal and international

---

**4.** Defendants, again noting that this March 11, 1990 statement is before the class period, contend that Ruckelshaus's statement referred to *revenue* growth, not *earnings* growth. Defendants have provided summary judgment evidence that Ruckelshaus was only referring to revenue growth. (Ruckelshaus Deposition, Docket Entry No. 161, Tab 22, p. 55). Plaintiffs challenge the use of a "self-serving affidavit." However, other, objective, summary judgment evidence supports the argument that Ruckelshaus's statement referred to revenue growth. The 1989 Form 10–K showed that revenues for fiscal year 1989 had increased over the prior year by 23 percent and net income had increased over the prior year by 16 percent. The *net income* increases were outside the 17 percent to 25 percent range referred to in Ruckelshaus's March 11, 1990 statement. The *revenue* increases, however, were within that range.

growth are business areas of great promise that we are pursuing aggressively.

(Docket Entry 121, Exhibit 49, p. 2).

This statement does not make any specific prediction of BFI's performance during a particular time period. This statement falls within the "puffery" category. *See, e.g., Raab v. General Physics Corp.,* 4 F.3d at 290, in which the Fourth Circuit stated as follows:

The whole discussion of growth is plainly by way of loose prediction, and both the range of rates cited, as well as the time for their achievement, are anything but definite. No reasonable investor would rely on these statements, and they certainly are not specific enough to perpetrate a fraud on the market. Analysts and arbitragers rely on facts in determining the value of a security, not mere expressions of optimism from company spokesmen. The market gives the most credence to those predictions supported by specific statements of fact. . . .

4 F.3d at 290.

The challenged statement does not make any specific performance prediction. It is the type of statement that the *Raab* court found to be "mere puffery."

## VI. The First Class Period Statements

### A. Economic Conditions in the Northeast and Mid–Atlantic States

■ Plaintiffs allege that defendants "concealed the extent to which BFI relied upon the operations of its Mid–Atlantic and Northeastern regions," which accounted for 26% of BFI's solid waste business. Plaintiffs allege that: "[a]s 1990 progressed and economic conditions worsened, BFI began to experience a material decrease in revenues and profits particularly in its third fiscal quarter ended June 30, 1990. To explain its third quarter results, BFI admitted only that its business in New England had been adversely impacted by economic conditions. Defendants concealed the extent to which BFI relied upon the operations of its Mid–Atlantic and Northeastern regions." (Docket Entry No. 23, ¶ 70).

The undisputed summary judgment record shows that BFI's revenues increased throughout fiscal 1990. Income from continuing operations also increased throughout the first three quarters of fiscal 1990 as compared to the year before. Income from continuing operations decreased in the *fourth quarter* of fiscal year 1990. BFI did not "explain its third quarter results" by "admitting only that its business in New England had been adversely impacted by economic conditions." The explanation for the fourth quarter and fiscal 1990 results included, but was not limited to, the effect of economic conditions in the New England and Mid–Atlantic areas.

BFI did discuss the impact of economic conditions in New England in the 1990 Form 10–K section entitled Management Discussion of Revenues. In that discussion, BFI stated, "[d]uring fiscal 1990, however, volume growth declined significantly due to greater competition for new business, weakening economic conditions, principally in the northeastern United States and along the Atlantic seaboard, and declines in landfill volumes at a number of large disposal sites." (Docket Entry No. 159, Tab 13, p. 15).

Plaintiffs appear to argue that defendants should have explicitly stated that the New England and Mid Atlantic states accounted for 26 percent of BFI's solid waste business. These two regions, that are alleged to account for 26 percent of revenues, were two regions out of nine. The share of the total solid waste volume in two out of nine regions was not so disproportionate or anomalous as to require more specific disclosure. BFI did disclose that economic conditions in the northeastern United States and along the Atlantic seaboard were among the causes of the decrease in volume growth in 1990. Plaintiffs' complaint appears to boil down to an allegation that BFI had a duty to describe the effect quantitatively rather than qualitatively. A firm need not release all the data, assumptions and methods behind its public disclosures. *Krim,* 989 F.2d at 1446–47; *cf. Virginia Bankshares Inc. v. Sandberg,* 501 U.S. 1083, 1094–95, 111 S.Ct. 2749, 2759, 115 L.Ed.2d 929 (1991). Plaintiffs have not provided summary judgment evidence to raise a

disputed issue of fact that this "omission" was misleading or material.

## B. The Cumberland Farms Litigation and the Third Quarter Form 10–Q

Plaintiffs allege that the 1990 third quarter Form 10–Q, filed on August 9, 1990, falsely represented that BFI's belief that the outcome of the Cumberland Farms antitrust lawsuit would not have a material adverse effect on BFI. Plaintiffs allege that BFI should have set and disclosed a reserve for the Cumberland Farms litigation in the third quarter Form 10–Q.

In the 1989 Form 10–K, issued eight months before the first class period began, BFI's discussion of legal proceedings described the Cumberland Farms lawsuit. The following statement covered the legal matters described:

> Management of the Company believes that the ultimate resolution of these matters [including the Cumberland Farms litigation] does not pose a material risk of having a materially adverse effect on the Company's business or consolidated financial condition.
>
> . . . .
>
> While the resolution of any matter may have an impact on the Company's consolidated financial results for a particular reporting period, management believes that the ultimate disposition of these matters will not have a materially adverse effect upon the business or consolidated financial position of the Company.

(Docket Entry No. 117, Tab C, pp. 20–21).

BFI repeated the same statements in its 1990 third quarter Form 10–Q. (Docket Entry No. 117, Tab I, pp. 8–9). It is undisputed that before and on August 9, 1990, BFI warned investors that the Cumberland Farms litigation existed, and could "have an impact on the Company's consolidated financial results for a particular reporting period," but management did not believe it would have a materially adverse effect on BFI's business or consolidated financial position. The issue is whether this statement was materially misleading.

On June 21, 1990, BFI management learned that its codefendant, Waste Management Inc. ("WMI"), had agreed to settle with the Cumberland Farms plaintiffs for $19.5 million. (Docket Entry No. 129, Exhibit 56). WMI and BFI had signed a defense sharing agreement in July 1989. (Docket Entry No. 117, Tab A). Plaintiffs contend that the sharing agreement obligated BFI to pay its "designated share" of the settlement, and that, as of June 21, 1990, BFI knew that it "had to" settle for at least as much as WMI. Plaintiffs argue that BFI should have set a reserve and disclosed it in the third quarter Form 10–Q, filed on August 9, 1990.

■ A reserve is required for a contingent liability when it appears "probable" as opposed to "reasonably possible" or "remote" that a liability has been incurred, in an amount that can be "reasonably estimated." *In re: Westinghouse Sec. Lit.*, 832 F.Supp. 948, 973 (W.D.Pa.1993); FAS, Statement of Financial Accounting Standards, No. 5 at ¶ 8.

■ Plaintiffs' first contention is that WMI's settlement made BFI's settlement inevitable. The WMI/BFI defense sharing agreement stated that:

> Other than as set forth in Article III below, nothing in this Agreement shall be construed as requiring the remaining Party to reimburse the Settling Party for any Settlement Payments made by the Settling Party. In particular, if a Final Judgment is entered in favor of a Party and against a Claimant, it shall have no obligation to make any Payment to the other Party with respect to that Claimant.

(Docket Entry No. 117, Tab A, Art. II(G)). The agreement also stated:

> If the Parties enter into a joint Settlement with a Claimant or a Final Judgment is entered against both Parties, the Parties shall make payment of their designated share of the amount of the joint Settlement or Final Judgment. If the Parties enter into separate Settlements with a Claimant, or if one Party settles with a Claimant and the other Party has a Final Judgment entered against it and in favor of that Claimant, the Parties shall make Payment of their designated shares of the aggregate

total of the settlement amounts or the aggregate total of the Settlement and Final Judgment.

(Docket Entry No. 117, Tab A, Art. III(A)(3)).

The sharing agreement did not obligate BFI to pay merely because WMI had settled. This conclusion is consistent with the testimony of plaintiffs' own expert, Victor C. Moore, that "[u]nder the terms of the Sharing Agreement entered into between WMI and BFI in 1989 that I have reviewed, BFI had a contractual obligation to pay its pro rata share of any settlement, unless BFI took the matter to court and prevailed on the claims against it at trial." (Moore Affidavit, ¶ 10(a)). WMI's settlement did not create a probable liability for BFI requiring disclosure on August 9, 1990.

A detailed review of the summary judgment evidence shows that, as of August 9, 1990, BFI did not expect to settle, did not reasonably believe that a loss was "probable," and could not reasonably estimate the amount of a loss or settlement. On June 5, 1990, two weeks before WMI's settlement became known, BFI's outside counsel wrote to Hoover as follows:

> The only change on this issue [settlement] since we last met is a meeting [CFL plaintiffs' attorney] had with Waste Management's lawyers. We opted not to attend . . . [Plaintiffs' counsel] said he had a great case, particularly against us, because of the materials from *Kelco.* [Plaintiffs' counsel] therefore upped his settlement figure from $70 million to $100 million. As the foregoing demonstrates, [Plaintiffs' counsel] is a) senile; b) totally ignorant about the case, and; c) a big talker.

> What this all means is that the possibility of a settlement now is very small, absent very significant movement by the parties. There is certainly no reason for us to move now; our motions [for summary dismissal] filed and to be filed will put pressure on plaintiffs. . . . It makes little sense, in my view, to make a settlement overture now.

(Docket Entry No. 129, Ex. 66, BFI3–001619, 1620).

Plaintiffs point to the facts that BFI had a management meeting on June 25, 1990 in which the WMI settlement was discussed, and that on July 24, 1990, a lawyer representing BFI wrote a letter to counsel representing the Cumberland Farms plaintiffs, stating: "If you wish, I would be happy to discuss the matter [settlement] further at your convenience," as evidence raising a fact issue that before August 9, 1990, BFI knew it would settle and could reasonably estimate the amount.

The mere fact that BFI management reviewed the WMI settlement on June 25, 1990 does not create a fact issue that a reserve had to be accrued. The letter from BFI's counsel was written *in response* to a letter from plaintiffs' counsel dated July 16, 1990, that raised settlement. BFI's counsel responded as follows:

> This is in response to your letter of July 16, 1990 concerning settlement.

> As you may know, the information set forth in your letter has been known to us for some time and does not, in my view, constitute evidence of a national conspiracy. Hence, our assessment of the case remains unchanged.

> We are, as I have told you, willing to discuss settlement on reasonable terms; indeed, I believe the case should be settled, if at all possible. However, we do not believe that $19.5 million you agreed to with Waste Management is reasonable in any sense as to BFI. In that regard, I would note that plaintiffs' proposed settlement with Waste Management appears to be limited to 14 geographic areas as to which governmental investigations were conducted. Of those, BFI did not even do business in 5 of them during the relevant periods, and only Waste Management and not BFI was charged with price fixing in Southern California, and South Florida. In fact, of the 14 geographic areas, BFI and Waste Management were charged with conspiracy in only 2—Toledo and Atlanta—and the latter case was settled and releases given.

(Docket Entry No. 129, Ex. 58).

The Cumberland Farms plaintiffs' response to this letter, dated July 25, 1990,

informed BFI that BFI's position made further settlement efforts useless. (Docket Entry No. 161, Tab 7, DBI00054). This exchange provides no support for plaintiffs' position.

Plaintiffs also rely on an October 7, 1989 audit letter response by BFI's outside counsel, Dewey, Ballantine, Bushby, Palmer & Wood ("Dewey Ballantine") that stated: "At this point, we are unable to express our opinion on the probable outcome of this litigation or estimate the amount or range of potential loss." The summary judgment evidence is that BFI subsequently sent Dewey Ballantine a letter dated November 10, 1989, asking if Dewey Ballantine disagreed with BFI's belief that the litigation Dewey Ballantine was handling for BFI, which included Cumberland Farms, would not have a materially adverse effect on BFI's financial position. (Docket Entry No. 161, Tab 4). Dewey Ballantine responded shortly thereafter that it did not differ with this position. (Docket Entry No. 161, Tab 5). This does not create a fact issue as to BFI's duty to set a settlement reserve.

■ A company need not attempt to quantify a contingent liability through rough guesses or speculation. *S.E.C. v. Steadman*, 967 F.2d 636, 645 (D.C.Cir.1992). In *Steadman*, the D.C. Circuit held that a mutual fund was not required to book a reserve for penalties for not registering under state Blue Sky laws when the S.E.C. calculated the fund liability at $694,000 and the mutual fund calculated its liability at $100,000. The court held that the fund should have disclosed the fact that it had violated Blue Sky laws by not registering, but did not need to set a reserve. In *Steadman*, liability was established, and only the amount was in question. The court held that the defendant was not required to set a reserve for the amount if the plaintiffs' estimates of liability differed vastly from the defendants.

Unlike the defendant in *Steadman*, on August 9, 1990, BFI was not facing established liability and did not believe that an adverse result was probable. Like the defendant in

*Steadman*, BFI had a much different estimate of possible settlement value than plaintiffs.

The summary judgment evidence does not raise a fact issue that BFI's August 9, 1990 disclosure of the Cumberland Farms lawsuit was a material misrepresentation at the time it was made.[5]

### C. The Flying Cloud Sanitary Landfill

On September 11, 1990, a BFI subsidiary, Woodlake Sanitary Service ("WSS"), announced that it was withdrawing its application for a permit to expand the Flying Cloud Sanitary landfill in Eden Prairie, Minnesota.

Plaintiffs contend that BFI's third quarter Form 10–Q, signed on August 3, 1990 and filed on August 9, 1990, should have stated a loss reserve because problems in BFI's permit application for the Flying Cloud landfill would require BFI to withdraw the permit application.

The third quarter 1990 Form 10–Q gave the following information with respect to the BFI's landfills, including Flying Cloud:

> The company and certain subsidiaries are involved in various other administrative matters or litigation, including environmental proceedings relating to governmental actions resulting from the involvement of various subsidiaries of the Company with certain waste sites (including Superfund sites), that could result in additional litigation or other adversary proceedings. While the resolution of any matter may have an impact on the Company's consolidated financial results for a particular reporting period, management believes that the ultimate disposition of these matters will not have a materially adverse effect upon the business or consolidated financial position of the Company.

(Docket Entry No. 117, Tab I, p. 9).

Plaintiffs complain of BFI's failure to disclose in the third quarter 1990 Form 10–Q that: (1) BFI had just learned that an employee at the Flying Cloud landfill had con-

---

5. BFI settled the Cumberland Farms litigation for $30.5 million, (Docket Entry No. 129, Ex. 68, BFI3–001831), which was included in a one-time special charge against fourth quarter 1990 earnings. The settlement amounted to approximately three percent of BFI's stockholder equity.

cealed the discovery of methane gas outside the permitted areas; (2) BFI would have to withdraw the permit application; and (3) a reserve for the costs of withdrawal would be required. (Docket Entry No. 128, pp. 26–27).

### 1. Background: The Undisputed Summary Judgment Evidence

On July 30, 1990, a technician at the BFI subsidiary, WSS, reported his suspicions that a recently retired WSS district manager had concealed the fact that methane gas had been found outside the permitted area. (Hutton Affidavit, Docket Entry No. 117, Tab 2, ¶ 8). The next day, July 31, 1990, BFI regional personnel conducted gas sampling tests, which appeared to confirm the technician's suspicions. (Id. ¶ 9.) The regional personnel contacted the BFI corporate legal department and requested assistance in the investigation. (Id.) Hutton, BFI's Regional Counsel for the Western Region, participated in the initial investigation.

On August 2, 1990, facts concerning the discovery of methane gas at the Flying Cloud landfill were read into the record of the ongoing contested case hearing concerning the expansion permit. This was a public hearing. BFI's disclosures were widely reported in the press. (Hutton Affidavit, Docket Entry No. 117, Tab 2, ¶ 12; Plaintiffs' Memorandum of Law in Opposition to Defendant's Joint Motion for Summary Judgments to First Class Period Claims, Docket Entry No. 128, p. 28).

Hutton made a preliminary report to Hoover (BFI's General Counsel) and Potwin (BFI's Associate General Counsel) on August 6, 1990. Hutton's August 6, 1990 memo stated that the information about the methane gas discovery was likely to have a "negative impact on the permit for expansion," and that the presence of refuse and/or methane in the nonpermitted area "may necessitate the redesign of the barrier well system and/or upgrading of the methane system." (Docket Entry No. 129, Ex. 61, BFI3–000741, BFI3–000744). Hutton recommended that BFI reveal the results of the internal investigation to regulatory authorities to the extent the results "relate[d] to technical issues," but

revelation of the results concerning the "operational issues may or may not be appropriate, depending upon whether efforts to expand the landfill continue." (Docket Entry No. 121, Ex. 61, BFI3–000741).

BFI told WSS to conduct an engineering investigation and make full disclosure of the results to the Minnesota Pollution Control Agency. (Hutton Affidavit, Docket Entry No. 117, Tab 2, ¶ 14). On August 10, 1990, WSS sought to continue the contested case hearing to continue its investigation into the source and extent of the methane and to reevaluate the technical merit of the project. (Id. at ¶ 15).

BFI hired outside consultants during August 1990 to perform technical reviews of the methane system, barrier well system, and bluff stability, and to review the political factors that might affect the permit. The reviews were anticipated to take approximately two months. (Id., BFI3–000728). BFI's own investigation continued through August 27, 1990. (Hutton Affidavit, Docket Entry No. 117, Tab 2, ¶ 18).

In early September 1990, the attorney general for the State of Minnesota threatened BFI with legal action. (Hutton Affidavit, Docket Entry No. 117, Tab 2, ¶ 21). On September 7, BFI decided not to allow WSS to continue its expansion application. (Ruckelshaus Affidavit, Docket Entry No. 117, Tab 4, ¶ 10). On September 11, BFI withdrew its application. (Docket Entry No. 117, Tab 2, ¶ 23). On September 12, BFI made a public announcement of the withdrawal.

BFI began analyzing the financial consequences of the withdrawal after September 11, 1990. (Hopkins Affidavit, Docket Entry No. 117, Tab 1, ¶ 18). In early October, WSS entered into a consent order with the Minnesota Pollution Control Agency that imposed continuing obligations on WSS. On October 9, 1990, WSS entered into a settlement with the City of Eden Prairie, Minnesota and with the homeowners' association representing residents living near the landfill. (Docket Entry No. 177, Tab 2, ¶ 24).

BFI's fourth quarter special charges, announced on November 6, 1990, included a $25 million charge against income relating to the

Flying Cloud landfill and other landfill projects. (Docket Entry No. 117, Tab 1, ¶ 19).

### 2. Duty to State a Reserve on August 9, 1990

A reserve must be set when it appears "probable" as opposed to "reasonably possible" or "remote" that an asset has been impaired, by an amount that can be "reasonably estimated." *See In re: Westinghouse Sec. Lit.*, 832 F.Supp. at 973; Statement of Financial Accounting Standards, No. 5 at ¶ 8.

■ Plaintiffs allege that "[d]efendants are the second largest waste management company in the country and have had years of experience in determining costs associated with closing landfills. While defendants might not have known the exact amount of any reserve, they certainly knew or were able to estimate a range within which the closing of a landfill, such as Flying Cloud, would typically cost [as of August 9, 1990]." (Docket Entry No. 128, at p. 29).

The summary judgment evidence, however, does not support the application of this assumption to these facts. The record shows that, on August 9, 1990, BFI had not yet decided to withdraw the permit application. Even after that decision was made, the only evidence is that it then took BFI time to analyze the financial consequences.

#### a. The Duty to Disclose that the Permit Would Be Withdrawn

Plaintiffs argue that by August 9, 1990 BFI knew or recklessly disregarded that BFI would have to withdraw the permit application. (Docket Entry No. 128, p. 28).

The discovery of methane gas outside the permitted area was read into the public record of the contested case hearing in Minneso-ta on August 2, 1990. The hearing and BFI's disclosures were both widely reported in the press. (Hutton Affidavit, Docket Entry No. 117, Tab 2, ¶ 12). Plaintiffs acknowledge in their Memorandum of Law in Opposition to Defendants' Joint Motion for Summary Judgment as to First Class Period Claims that the problems at the Flying Cloud landfill had received negative publicity before the third quarter Form 10–Q was issued. (Docket Entry No. 128, p. 28).[6]

Plaintiffs rely on an August 6, 1990 memo from Hutton to Hoover to support their allegation that BFI knew that the permit would have to be withdrawn. This memo reveals that BFI management first learned of the possible presence of methane gas in unpermitted areas on July 31, 1990. Hutton issued his memo five days after BFI management first learned of the problem, and after two days of investigation.

The Hutton memo discussed the possible implications of the recently discovered information, including that it could have a negative impact on the chances for an expansion permit. The memo also discussed alternative actions to be taken if the permit for expansion continued to go forward. (Docket Entry No. 129, Ex. 61, BFI3–000746). This memo does not raise a disputed issue of fact that by August 6, 1990, management had concluded or recklessly ignored the conclusion that the expansion permit would have to be withdrawn. BFI in fact undertook the investigations that Hoover outlined. Throughout August 1990, BFI continued to analyze different options.

In an internal memorandum from Hutton to Hoover dated August 20, 1990, Hoover discussed the ongoing review of issues. This August 20, 1990 memo stated as follows:

---

**6.** In a fraud on the market case, a defendant's failure to disclose material information may be excused where that information has been made credibly available to the market by other sources. *Raab v. General Physics Corp*, 4 F.3d 286, 289 (4th Cir.1993) (holding that the failure to disclose a slow down in contract awards in the Annual Report was not actionable because the defendant had contemporaneously informed the market of the same fact in a press release); *In re Apple Computer Securities Litigation*, 886 F.2d 1109, 1116 (9th Cir.1989), *cert denied, Schneider v.* *Apple Computer*, 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990), (plaintiffs' allegation that defendants had failed to disclose material information about the "Lisa" computer should be dismissed when defendants provided evidence that the press had already discussed the risks Apple was taking with the "Lisa"); *Basic Inc. v. Levinson*, 485 U.S. 224, 248–49, 108 S.Ct. 978, 992, 99 L.Ed.2d 194 (1988) ("the presumption that a fraudulent statement has been transmitted through market price may be rebutted by a showing that 'corrective statements' have credibly entered the market").

Despite the difficulties arising out of the discovery of the document and the continuance [of the regulatory hearing], in the end the chances of success of this project have been strengthened. This is because Woodlake has publicly turned away from a "win at all costs" strategy, acted in accordance with the highest ethical standards, and has begun to actively involve concerned citizens and municipalities in the operation of the landfill.

(Docket Entry No. 161, Tab 8, BFI3–000729). On August 27, 1990, BFI completed its investigation. At that time, BFI Region personnel, and Hutton, concluded that WSS should continue to seek the permit. (Docket Entry No. 117, Tab 2, ¶ 19).

When, as here, there is a very short period between the discovery of adverse facts (July 30 or 31, 1990) and the date on which disclosure was allegedly required, (August 6 or 9, 1990) the inquiry is as follows:

... [T]he information about which the issues revolve must be "available and ripe for publication" before there commences a duty to disclose. To be ripe under this requirement, the contents must be verified sufficiently to permit the officers and directors to have full confidence in their accuracy. It also means, as used by the Second Circuit, that there is no valid corporate purpose which dictates the information not be disclosed. As to the verification of the data aspect, the hazards which arise from an erroneous statement are apparent, especially when it has not been carefully prepared and tested. It is equally obvious that an undue delay not in good faith, in revealing facts, can be deceptive, misleading, or a device to defraud under Rule 10b–5.

*Financial Indus. Fund, Inc. v. McDonnell Douglas Corp.,* 474 F.2d 514, 519 (10th Cir.), *cert. denied,* 414 U.S. 874, 94 S.Ct. 155, 38 L.Ed.2d 114 (1973), *citing Mitchell v. Texas Gulf Sulphur Co.,* 446 F.2d 90 (10th Cir. 1971), *cert. denied,* 404 U.S. 1064, 92 S.Ct. 734, 30 L.Ed.2d 754 (1972).

In *McDonnell Douglas,* the plaintiffs had complained that management violated the securities laws because they did not issue an earlier special earnings report. On May 27, 1966, the president of McDonnell Douglas had been advised that the aircraft division of the company was experiencing delays in deliveries of component parts. He sent corporate officials to determine the extent of the problems. The management group reported back on May 31 that delivery of 18 airplanes on the assembly line would be delayed until the next fiscal year. The company announced the delay on June 1. During the next three weeks the company studied the situation, and issued a press release on June 23 related to earnings. The Tenth Circuit held that there was no evidence that could lead a jury to conclude that the process of evaluating the situation had not been conducted with reasonable dispatch, considering the need to ascertain the details as to the particular problems, relate them to earnings, and to arrive at a conclusion with confidence that the statement when issued would be correct. *McDonnell Douglas,* 474 F.2d at 518.

Plaintiffs in the present case have provided no summary judgment allegations or evidence that BFI unreasonably delayed its evaluation of the Flying Cloud landfill. Plaintiffs have presented no competent summary judgment evidence that the people involved in or responsible for the third quarter Form 10–Q knew about the problems at the Flying Cloud landfill before July 30, 1990. Plaintiffs have presented no allegations or evidence that defendants' failure to have earlier knowledge of the problems was reckless. Plaintiffs have not provided summary judgment evidence to raise a disputed fact issue that BFI's investigation was performed improperly, or that the investigation was made without the reasonable dispatch required by *McDonnell Douglas.*

Plaintiffs assert that BFI had a duty to reach and disclose a decision to withdraw from a multi-year, multi-million dollar landfill project, within ten days. This is the type of decision that, as the Tenth Circuit realized, requires a careful evaluation of the developing facts. *McDonnell Douglas,* 474 F.2d at 518. BFI's decision as to how it should respond to the adverse facts as to the landfill, discovered on July 30, 1990, required verification of the facts and analysis. There

is no evidence that BFI had done that work or made that decision on August 9, 1990.

Plaintiffs have not shown a disputed issue of fact that, as of August 9, 1990, management actually knew or recklessly disregarded that the permit would have to be withdrawn. The summary judgment evidence does not create a disputed question of fact that BFI was fraudulent in failing to reach and announce such a conclusion in the ten days between the time that BFI management first learned of the methane gas and the time BFI filed the Form 10–Q on August 9, 1994.

### b. Reasonably Estimable Amount

BFI Controller Hopkins has stated in his affidavit as follows: "[after September 11, 1990, when it was clear that the landfill would be closed rather than expanded, it was necessary to decide, what, if any, charge to earnings should be made on account of the Flying Cloud landfill. This required me, my accounting staff and Arthur Andersen to analyze a number of matters, including capital costs already incurred in connection with the Landfill and costs associated with closure and post-closure of the Landfill. Calculating closure and post-closure costs of the Landfill was particularly difficult since even after September 11, 1990, the case was still pending before the Minnesota Pollution Control Agency and no agreement had been reached at that time concerning the expenditures BFI would need to make to ultimately close the Flying Cloud Landfill]." (Hopkins Affidavit, Docket Entry No. 117, Tab 1, ¶ 18). This statement is consistent with the facts that BFI did not settle with the City of Eden Prairie and the local homeowners until October 9, 1990, and did not settle with the state regulatory authority until early October 1990.

This court finds no basis in the summary judgment record for holding that BFI committed fraud by failing to disclose a reserve for withdrawing its permit application only ten days after BFI had first learned about important negative facts. The undisputed evidence is that on August 9, 1990, BFI was still in the process of ascertaining the information, relating the information to the financial consequences, and arriving at conclusions as to the financial impact that were correct.

The information necessary to set a reserve was simply not "available and ripe for publication." *McDonnell Douglas,* 474 F.2d at 518.

Because plaintiffs have not shown that there is a disputed issue of fact as to additional disclosures on the Flying Cloud landfill, summary judgment for the defendants is appropriate.

### D. Thorne–Thomsen's September 1990 Statements

### 1. Recession–Resistant

▇▇▇ Plaintiffs assert that during a September 26, 1990 seminar for investment professionals, Thorne–Thomsen, BFI's Vice–President of Strategic Planning and Investor Relations, falsely assured the assembled market professionals that BFI was "recession-resistant." Thorne–Thomsen's comment was in the following context:

> We provide a service that has to be done every day of the week. It's not a service that can be postponed. It's a predictable service, and it is somewhat recession resistant. And that's something we've been saying for years, is that our business has some recession resistant characteristics. It is not recession proof, and one of the characteristics of a recession resistant business is that the growth rate perhaps slows during an economic downturn, but the growth rate does not stop. And I think that's an important characteristic of our business is that we have a broad geographic base. We are not dependent on any one particular part of the country. We don't quite have as many dots on the map as some of the other people anticipate that they are going to have, but nonetheless, we've got a number of dots on the map and about $3 billion worth of revenues. The importance of this slide is that we are not dependent on any one particular part of the country. For example, we are seeing some economic problems in the northeast and those numbers are affecting the company as a whole, but they don't

have a dramatic impact on the company as a whole.

(Docket Entry 129, Ex. 45, pp. 2–3).

Thorne–Thomsen specifically stated that BFI's business was *not* recession-proof. His strongest statement was that the business had "some recession resistant characteristics" and is "somewhat recession resistant." He explained the basis for the statement. Plaintiffs have failed to raise a material issue of fact that this statement was a false "assurance."

### 2. "Comfortable" with the Analysts' Estimates

On September 12, 1990, news services reported that Thorne–Thomsen had stated that BFI was "comfortable" with analysts' earnings estimates for the year of $1.99–$2.00 per share.

■ Defendants argue that because BFI did not have control over the media quotations of the remarks on September 12, 1990, the company cannot be held liable for the September 12, 1990 statement, citing *Raab v. Gen. Physics Corp.*, 4 F.3d at 288. However, Thorne–Thomsen admitted making a remark similar to the September 12, 1990 remark on September 26, 1990. According to Thorne–Thomsen's affidavit, "a reporter persistently asked me to comment on the Wall Street analysts' estimates of BFI's earnings for 1990. I replied that, given the facts I knew at that time, I had no quarrel with the numbers he quoted. As I recall, he mentioned earnings per share of approximately $2.00 for the fiscal year 1990." (Thorne–Thomsen Affidavit, Docket Entry No. 117, Tab 3, ¶ 8). This court examines the remarks to determine if there is a disputed issue of material fact whether the remarks suggested reliability, bespoke caution, were made in good faith, or had a sound factual or historical basis. *Isquith v. Middle South Util.*, 847 F.2d at 203–204.

■ The September 12, 1990 statement included Thorne–Thomsen's comments that some analysts had been "too optimistic" in their forecasts; that BFI was concerned with the effect of weakness in the economy, particularly in the Northeast; and that "the company does not make earnings projections." (Docket Entry 159, Exhibit X, Tab 9). The September 26, 1990 statement was made after a lengthy prepared presentation at an analysts' seminar, during which Thorne–Thomsen cautioned that BFI was not recession-proof.

Plaintiffs claim that by September 26, 1990, the July and August 1990 monthly operating results showed that there was "no possibility" that BFI would "come anywhere near" earning $.54 per share for the fourth quarter. There is no indication that on either September 12 or September 26, Thorne–Thomsen was asked about, or made any comment on, anticipated fourth quarter 1990 operational results.

Plaintiffs also claim that Thorne–Thomsen's statement of his "comfort" with analysts' estimate of year-end earnings of $1.99–$2.00 per share was fraudulent. It is undisputed that the 1990 year-end earnings for continuing operations, announced on November 6, 1990, were $1.95 per share before fourth quarter special charges. The difference between the $2.00 that analysts were predicting and the actual results of $1.68 came in large part from the one-time fourth quarter special charges.

On September 12 and 26, 1990, the settlement of the Cumberland Farms case had not yet occurred and was not "probable." There is no basis for finding that on those dates, Thorne–Thomsen had a reasonable basis for believing that the year-end results could be materially impacted by special charges against net income for the Cumberland Farms settlement.

However, on September 11, 1990, BFI had withdrawn the expansion permit for the Flying Cloud landfill. BFI had announced the withdrawal on September 12, 1990. BFI was still analyzing the financial impact of this development on September 26, 1990. The analysts' estimate of $2.00 per share was unchanged from the forecasts made before the September 12, 1990 announcement of the closing of the Flying Cloud landfill. By September 26, 1990, the closing of the landfill was already in the "total mix of information." *See Raab v. General Physics Corp.*, 4 F.3d at

289. There is no indication that Thorne–Thomsen was asked about the possible impact of the permit withdrawal on projected year-end income.

Thorne–Thomsen was not asked whether he was comfortable with the analysts' numbers as an estimate of income from continuing operations, before any one-time special charges. The question is whether Thorne–Thomsen's failure to state that his "comfort" with the analysts' earnings estimate did not factor in possible special charges against operating income was material and was made with *scienter*.

The few cases that have examined public comments by management on analysts' projections have found that such statements do not imply certainty of future results and are not actionable. *Raab v. General Physics*, 4 F.3d at 288–290; *Borow v. nView Corp*, 829 F.Supp. 828 (E.D.Va.1993); *In re Marion Merrell Dow Inc. Securities Litigation II*, 1994 WL 396187 (W.D.Mo.1994). In *Borow*, the court found that a comment by a company's president in an interview that he was "comfortable" with analysts' 1992 earnings estimates was not actionable. The court in *Marion Merrell Dow* held that an officer's statement at a research conference that analysts' earnings estimates for 1993 were "basically on target," and "pretty close," were not actionable as a matter of law. In *Raab*, the court held that a press release in which the company stated that "the results during the remainder of the 1992 [sic] should be in line with analysts' current projections," was not actionable as a matter of law. Thorne–Thomsen's statement that he was "comfortable" with analysts' earnings estimates is similar to the type of comment that these courts have found not actionable.

However, for the purpose of this motion, this court will assume that Thorne–Thomsen's statements were "material." The question is whether there is a fact issue as to *scienter* that precludes summary judgment.

The Fifth Circuit has defined the required *scienter* as follows:

limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Shivangi v. Dean Witter Reynolds, Inc.*, 825 F.2d 885, 889 (5th Cir.1987). A plaintiff must present summary judgment evidence to raise a material disputed issue that defendant acted with an actual intent to deceive, manipulate, or defraud, or that the defendant acted with severe recklessness. *Id.* Severe recklessness is not ordinary or even unexcusable negligence.

There is no evidence in the record that Thorne–Thomsen intentionally misled the market professionals into believing that his "comfort" with the $2.00 per share estimate included possible special charges against operating income. The evidence at most supports an inference that when Thorne–Thomsen responded to the questions at the press conference, he could have been clearer in explicitly stating that his "comfort" with the analysts' estimates was as to estimated operating income, and did not include possible special charges, including the possibility that the Flying Cloud permit withdrawal could lead to a substantial write-off.

As noted above, on September 26, 1990, certain events important to BFI's analysis of the financial consequences from the permit withdrawal had not yet occurred, or were still in progress. BFI and Arthur Andersen were still studying the financial impact of the landfill closure. WSS's settlement with the City of Eden Prairie, the homeowners, and the Minnesota Pollution Control Agency had not yet occurred. Assuming that Thorne–Thomsen was negligent in failing to point out that his "comfort" with the analysts' estimates did not include the possible effect of the uncertain outcome of these events, this is not enough to raise a disputed fact issue that he intended to defraud or was severely reckless. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976) (to violate section 10(b) defendants must have acted with an "intent to deceive, manipulate, or defraud"); *Huddleston v.*

*Herman & MacLean,* 640 F.2d 534, 545 (5th Cir.1981), *rev'd on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1982); *S.E.C. v. Steadman,* 967 F.2d at 642–43, (D.C.Cir.1992). Summary judgment for the defendants on this issue is appropriate.

### 3. "Market Malaise"

■ Thorne–Thomsen was quoted in the *Professional Investor Report* as blaming general "market malaise" for a $1.75 drop in BFI's stock price on September 26, 1990. Plaintiffs have not provided any summary judgment evidence to show that there was, in fact, another cause for the drop in BFI's stock price on that day. Neither have plaintiffs provided any summary judgment evidence to show that Thorne–Thomsen knew at the time he made the statement of any other explanation for the drop in stock price. Summary judgment on this claim is appropriate.

### VII. The Second Class Period

Plaintiffs allege that during the second class period, defendants engaged in "an integrated course of conduct ... to create the false and misleading impression that in fiscal year 1991, BFI was about to turn the corner from its disastrous fiscal 1990. Defendants, knowing that 1990 was a harbinger of worse things to come, succeeded in convincing investors that the worst was behind BFI and that operating income for 1991 would be at, or very near, the $257 million earned in 1990." (Docket Entry No. 121, p. 2–3). On September 3, 1991 BFI announced that it expected income from continuing operations to be 12 percent to 15 percent below fiscal 1990 results. At various times during the 1991 fiscal year, four of the individual defendants sold some of their BFI stock. Plaintiffs allege material misrepresentations made with the motive of inflating BFI's stock price.

### A. Summary of Challenged Second Class Period Disclosures

| | |
|---|---|
| 11/6/90 | **Press release** stating that "[i]n spite of a disappointing quarter, the future for the Company looks bright. Our core markets continue to grow.... With these actions today, we have placed these matters behind us and we are poised for the next round of growth.... [o]ur core markets continue to grow with more emphasis on emerging business segments such as recycling and medical waste providing significant growth opportunities for the company." |
| 12/14/90 | **1990 Form 10–K** |
| Statement: | "[m]anagement currently expects that income from continuing operations for fiscal 1991 may be only slightly above the $257 million of income from continuing operations reported for fiscal 1990." |
| 2/6/91 | **Reuters article** stating that BFI "expects net income from continuing operations in the year ending September 3 [sic] may be only slightly above the 256.8 mln dlrs [sic] reported for fiscal 1990, the annual report said." |
| 1/23/91 | **BFI press release** announcing fiscal 1991 first quarter results |

| | | |
|---|---|---|
| Revenues | $801,799,000 | 15% over prior year |
| Income from Operations | $118,110,000 | −9% from prior year |
| Income from Continuing Operations | $ 60,836,000 | −13% from prior year |

| | |
|---|---|
| 2/12/91 | **First Quarter Form 10–Q** (for the three months ending 12/31/90) |
| Statement: | "[M]anagement currently expects that income from continuing operations for fiscal 1991 may be somewhat less than the $257 million of income from continuing operations reported for fiscal 1990." |
| 4/17/91 | **BFI press release** announcing fiscal 1991 second quarter results |

| | | |
|---|---|---|
| Revenues | $764,284,000 | 8% over prior year |
| Income from Operations | $112,016,000 | −17% from prior year |
| Income from Continuing Operations | $ 57,328,000 | −20% from prior year |

| 5/9/91 | **Second Quarter Form 10–Q** (for the three months ending 3/31/91) |
| Statement: | "[B]ased on the trends experienced to date, it is management's current belief that income from continuing operations could be somewhat below the $257 million of income reported for the prior year." |

| 6/27/91 | **Press release** |
| Statement: | "Based upon trends experienced to date, management of BFI currently believes that results from continuing operations for the second half of fiscal 1991 will approximate results from the first half of the fiscal year. As a result, income from continuing operations for fiscal 1991 will be lower than the $257 million ($1.68 per share) reported for fiscal 1990." |

**7/19/91** **Press release** announcing fiscal 1991 third quarter results.

| Revenues | $805,234,000 | 5% over prior year |
| Income from Operations | $113,963,000 | −25% from prior year |
| Income from Continuing Operations | $ 58,927,000 | −28% from prior year |

| 8/9/91 | **Third Quarter Form 10–Q** (for the three months ending 6/30/91) |
| Statement: | "[I]ncome from continuing operations for fiscal 1991 will be approximately 10% lower than the $257 million ($1.68 per share) reported for fiscal 1990." |

**9/3/91** Form 8–K dated 8/31/91 filed, **announcing management's belief that "results from continuing operations for the fourth quarter of the 1991 fiscal year will be approximately 15% to 25% less than the results experienced in the third quarter of fiscal 1991. As a result, management currently believes that income from continuing operations for fiscal 1991 will be approximately 12% to 15% lower than the $257 million ($1.68 per share) reported for fiscal 1990."**

BFI stock price drops 16 percent. **The second class period ends.**

---

### B. The Press Release of November 6, 1990

The press release dated November 6, 1990 disclosed the 1990 fourth quarter special charges, fourth quarter earnings, and year-end earnings. Plaintiffs challenge the statements in the press release that: "[i]n spite of a disappointing quarter, the future for the Company looks bright. Our core markets continue to grow.... With these actions today, we have placed these matters behind us and we are poised for the next round of growth." (Docket Entry No. 117, Tab M). Plaintiffs allege that these "unequivocal statements of growth led investors to believe that BFI would grow in fiscal year 1991." (Docket Entry No. 121, p. 8).

The statements that "the future of the Company looks bright" and "[w]ith these actions today, we have placed these matters behind us and we are poised for the next round of growth," are soft, "puffing" statements. Such statements, not worded as guarantees, are not actionable under the federal securities laws. *Krim v. BancTexas Group,* 989 F.2d at 1446; *Raab v. General Physics Corp.,* 4 F.3d at 290.

These statements of opinion were made in the context of industry-specific and company-specific disclosures about the reasons for the decline in earnings. The press release compared the revenue and earnings numbers for the fourth quarter of fiscal 1990 with the results for the previous year, then stated as follows:

In addition to the special charges, several factors contributed to the decline in earnings in the fourth quarter, including weakening economic conditions in certain major markets, and reduced volumes and higher operating costs at a number of the company's landfills. Other factors included higher fuel costs for nearly 10,000 vehicles and increased interest expense. The company anticipates that these factors will continue to bear upon the results of continuing operations during fiscal 1991....

William D. Ruckelshaus, Chairman and Chief Executive Officer stated "In spite of a disappointing quarter, the future for the company looks bright. Our core markets continue to grow with more emphasis on emerging business segments such as recycling and medical waste providing signifi-

cant growth opportunities for the company. We are hard at work adapting to changes in our industry and putting in place a customer-focused quality program."

"With these actions announced today we have placed these matters behind us and are poised for the next round of growth," Ruckelshaus said.

The full text presents specific facts that BFI believed contributed to the poor fourth quarter fiscal 1990 results. These included the weakening economic conditions in BFI's major markets, reduced volumes and higher operating costs at a number of the company's landfills, higher fuel costs, and increased interest expense. BFI warned investors that it anticipated that these factors would continue during fiscal 1991. This court finds that the challenged statements "bespoke caution" as a matter of law, given the discussion of company-specific negative factors that were affecting growth and management's statement that it anticipated that these factors would continue. *Rubinstein v. Collins*, 20 F.3d at 167; *In re Compaq Securities Litigation*, 848 F.Supp. at 1318.

■ Plaintiffs also challenge Ruckelshaus's statement that "[o]ur core markets continue to grow with more emphasis on emerging business segments such as recycling and medical waste providing significant growth opportunities for the company." Plaintiffs argue that, at the time the statement was made, BFI's board was considering a 1991 budget with "only minimal market development." However, there is no evidence that it was unreasonable for Ruckelshaus to believe that these industry "segments" were growing. The record does not raise a disputed issue of fact that this description of the recycling and medical waste business was false or lacked a reasonable basis.

### C. The Fiscal Year 1990 Form 10–K and 1990 Annual Report

■ Plaintiffs complain of the following statement in the December 14, 1990 Form

10–K: "[m]anagement currently expects that income from continuing operations for fiscal 1991 may be only slightly above the $257 million of income from continuing operations reported for fiscal 1990." Plaintiffs allege that in December 1990, management had no reasonable basis for "unequivocally" stating that fiscal year 1991 would equal, much less exceed, the fiscal 1990 results. (Docket Entry No. 121, p. 10).

Plaintiffs' description of the statement as "unequivocal" is obviously incorrect. The actual text stated that "management currently expects that income for fiscal 1991 ... *may be only* slightly above ... income from fiscal 1990," (emphasis added). This is not an "unequivocal" statement that fiscal year 1991 income *would be* equal to or above fiscal year 1990.

Again, the statement must be analyzed in the context in which it was made:

*Excluding the special charges incurred*[7], the rate of growth in income from continuing operations for fiscal year 1990 was lower than the prior year, particularly in the fourth quarter, as a result of worsening economic conditions in certain of the Company's major collection services markets, and reduced volumes and higher operating costs at a number of the company's disposal sites. Although the reduced disposal site volumes were partially a function of a general weakening in the economy and increased competition, the reductions were largely attributed to delays in permit approvals and disposal volume constraints imposed at a number of major sites. Other factors contributing to the decline included higher fuel costs and increased interest expense. The Company believes that income from continuing operations for fiscal 1990 before special charges, while up 7% from fiscal year 1989, also began to reflect the impact of significant changes which are beginning to affect its North American operations and which will likely

7. BFI had earned $298 million from continuing operations in 1990 before special charges. BFI's $257 million income for continuing operations for fiscal 1990, ending on September 30, 1990, was *after* the fourth-quarter special charges of $67 million. Plaintiffs claim that BFI compared "apples and oranges" by projecting its 1991 operating results on the basis of 1990 results that included special charges. However, this fact was not withheld from investors or hidden.

continue in the future. By the end of fiscal 1990, 28 states had enacted mandatory recycling legislation, additional waste incineration capacity became operational in certain markets, the importation of out-of-state waste became more restrictive and a number of states adopted or indicated their intent to adopt versions of the proposed landfill regulations yet to be promulgated under Subtitle D of the Resource Conservation and Recovery Act (RCRA).

The near term effect of recycling, composting and other waste minimization legislation will likely have the effect of reducing landfill volumes in states where waste minimization, composting and recycling legislation has or will become effective. However, the public's demand for recycling and composting could create significant growth opportunities for the Company as these requirements increase and spread across North America. The Subtitle D requirements of RCRA, as presently proposed, will significantly increase landfill operating expenses, particularly construction costs of new airspace and higher accruals for closure and post closure monitoring and maintenance. For example, during fiscal 1990 the Company invested over $74 million in the construction of new landfill airspace and expects to spend in excess of $70 million in fiscal 1991. Although it is uncertain whether these higher costs will always be recoverable through increased revenues, the Company believes that its continued investment in state-of-the-art landfill disposal capacity is essential to meet its customers' long-term needs. *In light of the continued weakening of economic conditions in North America and the impact of the other factors mentioned, management currently expects that income from continuing operations for fiscal 1991 may be only slightly above the $257 million of income from continuing operations reported for fiscal 1990.*

(Docket Entry No. 121, Ex. 1, pp. 24–25) (emphasis added). BFI repeated the entire statement in its 1990 Annual Report, issued in January 1991.

### 1. Lack of a Reasonable Basis for Projecting 1991 Income

Plaintiffs allege that defendants' December 14, 1990 fiscal 1991 income projection was based upon a budget that defendants knew contained unreasonable assumptions. Plaintiffs point to the following evidence to support their claim:

a. In preparing the 1991 budget, BFI had assumed price increases at 60 percent of the level of increases for fiscal year 1990.

b. The 1991 budget assumed a pattern of increasing earnings through the quarters, which, according to the testimony of Norman Myers, BFI's Vice Chairman, was consistent with a "normal economy." Plaintiffs claim that as the recession deepened, this assumption became unreasonable.

c. BFI knew that the "possible impact of a full recession had not been factored into the proposed budget."

d. The budget assumed that EBINT margins would increase above 1990 levels to 20 percent in 1991.

e. The budget assumed fuel costs that were less than current price and tax levels.

f. Deposition testimony by Hopkins, Controller and Chief Accounting Officer, that the guidelines given to the regional vice presidents responsible for the budget were not revised to reflect that the country may be entering a recession in the third quarter of 1990. (Hopkins Deposition at 83:18–25).

 Plaintiffs must present a material issue of fact that BFI relied on the budget for its 1991 public projections; that such reliance was unreasonable; and that management was intentionally fraudulent or severely reckless in its reliance. The federal securities laws do not provide a cause of action for negligent misrepresentation. *Rubinstein v. Collins,* 20 F.3d at 169.

 Defendants acknowledge that the budget was prepared in May–September 1990 and did not include the full effects of the national recession that later developed.

(Docket Entry No. 160, p. 2). However, defendants assert that there is no summary judgment evidence to support plaintiffs' claim that the budget was the sole basis for BFI's fiscal 1991 public income projections. BFI has provided uncontroverted evidence that the September 1990 budget was not the only basis for the December 1990 public income projections. BFI's December 14, 1990 Form 10–K projected income that "may be only slightly above $257 million," a projection much lower than the budget forecast of $283 million.

The undisputed summary judgment evidence is that BFI continued to base its public projections on actual results during fiscal 1991, and did not simply use the budget estimates. The first quarter 1991 earnings results were $60.8 million, which, if annualized, would have been $243.2 million, or 5.3 percent below $257 million. BFI's February 12, 1991 first quarter Form 10–Q gave a 1991 income estimate from continuing operations that was less than the budget projection, stating that income "may be somewhat less than the $257 million...." (Docket Entry No. 160, Tab 6, p. 10).

The second quarter earnings results were $57.3 million. BFI's May 9, 1991 second quarter Form 10–Q again revised the budget estimate downward. The Form 10–Q stated that fiscal 1990 income "could be somewhat below the $257 million," noting that "[b]ecause of the uncertainties associated with the length and overall impact of the current economic downturn, the Company is unable to project its operating results for the remainder of the year with certainty." (Docket Entry No. 160, Tab 8, p. 12).

BFI prepared a Mid–Year Forecast that projected results for the second half of the year as only slightly above the actual results for the first part of the year. Based on this forecast, BFI issued a press release on June 27, 1991, stating that 1991 income from continuing operations "will be lower than $257 million" and that the "second half fiscal 1991 will approximate results from first half." This projection was a substantial downward departure from the 1990 budget estimate. The budget had projected $76.3 million in income for the third quarter of fiscal 1991;

the Mid–Year Forecast projected $59.3 million.

On July 19, 1991, BFI issued a press release reporting that BFI had earned $58.9 million in the third quarter. Three weeks later, BFI issued its third quarter Form 10–Q, projecting that 1991 income from continuing operations "will be approximately 10 percent lower than ... $257 million," which the budget had forecast.

The operating results for July and mid-August 1991 led BFI to issue a Form 8–K on September 3, 1991, projecting that fiscal 1991 income from continuing operations "will be approximately 12 percent to 15 percent lower than the $257 million ($1.68 per share) reported for fiscal 1990." The announcement led to a stock price fall of $4.00 in one day, and the amended complaint.

Plaintiffs cite *In re Compaq Securities Litigation* to support liability. In *Compaq*, the plaintiffs provided summary judgment evidence that the defendants' internal projections painted a much more pessimistic picture than defendants' public projections. Plaintiffs in this case have provided no such evidence. To the contrary, BFI's public projections in December 1990 were lower than the earlier, internal budget and were repeatedly modified during fiscal 1991 to reflect trends in actual results.

In a case involving similar allegations, the district court in *Kirby v. Cullinet Software*, 721 F.Supp. 1444 (D.Mass.1989), granted summary judgment for the defendants. The defendants had projected that the company "expects to grow in its first quarter of fiscal 1986 by 30 percent to 40 percent" and that it "expects to meet Cullinet's traditional 20 percent operating margin goal for the quarter." Plaintiffs argued that defendants had specific information that Cullinet would not meet the goals and that the forecasting system was unreliable. The court cited the standard for evaluating projections laid out by the Fifth Circuit in *Isquith:* a prediction must be made in good faith and with a sound historical or factual basis. *Kirby*, 721 F.Supp. at 1450 (*citing Isquith*, 847 F.2d at 203). The court then examined the evidence concerning

the reasonableness of defendants' reliance on its budgeting system.

The court found no unreasonable reliance on the internal forecast, in part because, as here, the defendants had reduced growth projections in recognition of adverse economic conditions and developments. The court rejected plaintiffs' contention that the defendants knew or should have known that the projected growth rate was unattainable, despite the testimony of one of the defendants that he used "guesses" to develop his monthly sales figures for the model. The court held that, considering the evidence in the light most favorable to the plaintiffs, a jury could not infer that the projection was knowingly false, or was made recklessly. *Id.* at 1453–54.

The *Kirby* opinion recognizes the unremarkable proposition that subjective opinions by management must play a role in the preparation of budgets and forecasts. *Kirby,* 721 F.Supp. at 1453–54. The court held that a jury could not infer that reliance on a budget was unreasonable where the budgeted monthly sales figures were "simply a [manager's] 'guess'" of what monthly sales would be and where the budget was based upon "subjective judgments." The *Kirby* court pointed out that defendants took economic and competitive conditions into account in the forecast by reducing the growth projections for the first quarter of the fiscal year. *Id.* at 1452. The court recognized that it could not second-guess whether the amount of the reduction taken in projecting future results was enough. Second-guessing such judgments in the light of hindsight is simply not a basis for securities fraud. *See, e.g., In re Software Toolworks, Inc. Securities Litigation,* 789 F.Supp. 1489, 1504 (N.D.Cal.1992) (second-guessing a decision as to the amount of a reserve required is a matter of judgment and not a basis for securities fraud).

In this case, plaintiffs assert that BFI's reliance on the 1991 budget in making the December 1990 public income projections was unreasonable because management did not "fully factor in" the effects of the national recession. Plaintiffs point to the November 1990 operating results reporting EBINT at 5 percent below budget and 6 percent below

November 1989 to argue that by December 1990, the budget was obviously unreasonable.

The undisputed evidence is that BFI management *did* take worsening economic conditions into account, first in creating the budget and then in changing its public projections from the budget forecast to reflect worsening conditions. Recognizing that price increases were becoming more difficult to achieve due to the economy, and recognizing increasing costs, management had budgeted price increases for fiscal year 1991 that were 60 percent of the previous year's increases. On December 13, 1990, BFI issued 1991 income projections that were lower than the budget, further reducing the forecast based on actual developments occurring after the budget.

The summary judgment evidence does not raise a fact issue that BFI's projection in the December 1990 Form 10–Q was based on dishonest or reckless disregard of adverse economic conditions. Defendants have produced uncontroverted summary judgment evidence that the December 1990 public projection took these factors into account by setting a projection that was below the budget and 14 percent below the income earned in fiscal 1990, even reduced by the 1990 special charges.

The fact that the budget assumed greater earnings in the later quarters of 1991 than in the earlier quarters does not raise an inference that the budget was unreasonable or unreasonably used. As in *Kirby,* evidence provided by plaintiffs themselves shows that the pattern throughout BFI's history was of better business in the second half of the year than the first. (Myers Deposition, pp. 69:13–18).

Plaintiffs have not raised a disputed issue of fact that defendants' use of the budget in making 1991 fiscal projections was fraudulent, or that the December 1990 projection for fiscal 1991 income was unreasonable when made.

### 2. "Bespeaks Caution" and Materiality

This court also finds that the statements concerning income for fiscal year 1991 made in the 1990 Form 10–K and the 1990 Annual

Report "bespoke caution." BFI discussed in detail the company-specific negative factors that were affecting operating income and would likely continue to do so. BFI warned investors that it was uncertain whether such continuing higher costs would be recoverable through increased revenues.

BFI's discussion is the type of analysis of firm-specific negative factors that the court in *In re Compaq Securities Litigation* was unable to find when it denied the defendants summary judgment. In *Compaq,* plaintiffs complained that management had issued misleadingly optimistic statements about near-term earnings growth when it was about to embark on a marketing plan that had specific risks, including reduced earnings per share. The court held that Compaq's public statements "contain[ed] no mention of the specific risks envisioned by management, and the court has found no mention in publicly disclosed material available during the class period that management's plans to increase market share and revenue in 1991 could lead to a decrease in earnings per share." *In re Compaq Securities Lit.,* 848 F.Supp. at 1318.

By contrast, BFI's statements in the fiscal 1990 Annual Report and 1990 Form 10–K discussed the company-specific factors that were affecting earnings and warned investors of negative factors that were likely to continue. This court finds, that, as a matter of law, BFI's discussion about future earnings "bespoke caution."

Plaintiffs acknowledge that BFI identified negative factors affecting BFI's future performance. Plaintiffs fault BFI for not disclosing just how serious these negative factors could be. Plaintiffs seek to second-guess management's predictions about the extent to which certain factors might be present in the future and the degree of impact those factors might have. Second-guessing, by hindsight, management's estimates of future performance is not the basis of securities fraud. There is no summary judgment evidence that at the time management made the challenged predictions it had internal information that contradicted its public projections and statements. As the Fifth Circuit recently held:

> While an issuer "must have a factual basis for any opinion evaluating investment in the company, an issuer is not required to release *all* the data, assumptions and methods behind its forward-looking statements." As Judge Easterbrook noted in *Wielgos v. Commonwealth Edison Co.,* 892 F.2d 509 (7th Cir.1989) ] "[s]ecurities laws require issuers to disclose *firm-specific* information; investors and analysts combine that information with knowledge about competition, regulatory conditions, and *the economy as a whole* to produce a value for stock.
> 892 F.2d at 515. . . . Similarly, projections of future performance not worded as guarantees are generally not actionable under the federal securities laws.

*Krim,* 989 F.2d at 1446 (emphasis added).

This court finds that plaintiffs have failed to raise a disputed fact issue that the opinions and estimates about fiscal 1991 income, made in the 1990 Form 10–K and 1990 Annual Report, were unreasonable or material. Summary judgment is therefore appropriate.

**D. The "Press Release" of February 6, 1991**

Plaintiffs' complaint alleges that a February 6, 1991 press release repeated the statement that net income from continuing operations "would be slightly above the $256.8 million reported for fiscal 1990," when BFI had already recognized that January 1991 results were below budget. Defendants have provided uncontroverted summary judgment evidence that this was not a BFI press release, but rather a Reuters dispatch summarizing BFI's 1990 Annual Report. (Docket Entry No. 160, Tab 4). The dispatch stated as follows:

> Browning–Ferris Industries Inc. expects net income from continuing operations in the year ending September 3 may be only slightly above the 256.8 million dollars reported for fiscal 1990, the annual report said.
> The 1990 profits from continuing operations were down eight percent from the 278.1 million dollars earned in fiscal 1090. Late last month, the company reported first quarter operating net of 118.1 million

dollars, down from 129.8 million dollars a year earlier.

The report also said the company budgeted 1991 capital spending of 552 million dollars, down from the 711 million dollars spent on continuing operations last year.

Browning–Ferris said its 1991 projections was made in light of the continued weakening of North American economic conditions and the "significant changes which are beginning to affect its North American operations and which will likely continue in the future."

The near term effect of recycling, composting and other waste minimization laws will likely be reduced landfill volume, while proposed U.S. regulations "will significantly increase landfill operating expenses," the company said.

Browning–Ferris believes 1990 earnings from continuing operations began to reflect these changes, the report said.

 Indirect quotations by third parties in news media over which a company has no control are not actionable under section 10(b). *Raab v. General Physics Corp.,* 4 F.3d 286, 288 (4th Cir.1993). The *Raab* court held that the securities laws do not require a company to police statements made by third parties for inaccuracies. The problems with third-party quotations that the Fourth Circuit identified in *Raab* are present here. The Reuters report did not reprint the extensive discussion contained in the 1990 Annual Report, although it did summarize some of the warnings. This court holds that the Reuters dispatch dated February 6, 1991 is not actionable because it was an indirect summary made by a third party that did not include the full cautionary language actually used by BFI.

### E. The 1991 First Quarter Form 10–Q, Dated February 13, 1991

 Plaintiffs claim that BFI's statement in the 1991 first quarter Form 10–Q that "[m]anagement currently expects that income from continuing operations for fiscal 1991 may be somewhat less than the $257 million from continuing operations reported for fiscal 1990," was false, without reasonable basis, and recklessly prepared. (Docket Entry No. 121, p. 16).

On January 23, 1991, BFI had issued a press release announcing that income from continuing operations for the first quarter of fiscal 1991, ending December 31, 1990, was $60,836,000, as compared to $69,776,000 for the same quarter in fiscal 1990. BFI revised its projections for fiscal 1991 by stating in its first quarter Form 10–Q, filed on February 15, 1991, that "management currently expects that income from continuing operations for fiscal 1991 *may be* somewhat less than the $257 million of income from continuing operations reported for fiscal 1990."

Management's discussion began by informing investors of the decrease in income growth for the first quarter as compared to the same period in fiscal year 1990:

Income from continuing operations of the Company for the first three months of fiscal year 1991 reflected a decline of 13% over the restated results for the comparable period of the prior year ...

The next paragraph of the report stated:

Although revenues increased by 15% for the first three months of fiscal year 1991 as compared to the same period of last year, income from operations for the current quarter declined by 9% from the restated amount for the prior year. This decline resulted from a change in the revenue mix due to growth in certain lower margin business areas and substantially higher operating expenses in many parts of the business. The following table presents ratios (shown as a percent of revenues) which reflect certain profitability trends of the Company's continuing operations and shows the Company's rations of earnings to fixed charges.

This paragraph was followed by a chart showing gross profit margin, selling and administrative expenses, special charges, income from operations, income before income taxes, and income from continuing operations, all expressed as a percentage of revenues, as well as the ratio of earnings to fixed charges.

The next paragraph contained a detailed discussion of the causes of the decreases in

operating income during the first quarter of fiscal 1991:

> Decreases in operating income were experienced in all of the domestic solid waste businesses with the exception of the solid waste collection and medical waste businesses, which continued to increase in spite of the effects of a slowing economy in many sections of North America. Operating margins declined between the periods principally due to (1) reduced volumes at the Company's disposal sites and transfer stations as a result of the lower economic growth in the country, state waste minimization requirements and increased recycling, as well as significantly higher landfill operating costs associated with environmental compliance for operation, closure and post-closure activities, (2) increased costs for disposal and fuel in the collection business, (3) increased revenues in the lower margin recycling business area, and (4) substantially increased revenues related to international operations at currently lower profit margins. *The economic recession is likely to impact revenue growth in a number of markets in North America which could result in some further dilution in operating margins and earnings growth over the remainder of the year and, as a result, management currently expects that income from continuing operations for fiscal 1991 could be somewhat less than the $257 million of income from continuing operations reported for fiscal 1990.*

(Docket Entry 129, Exhibit 20, p. 10) (emphasis added).

The challenged statement was a warning that, given the negative factors affecting the company during the first quarter of fiscal 1991, which the Form 10–Q discussed in detail, management believed that BFI may not achieve in fiscal year 1991 the same level of operating income that it had achieved in fiscal year 1990. Plaintiffs have not pointed to any evidence that the statement, taken in context, was false or lacked a reasonable basis.

Plaintiffs point to the deposition testimony of Hopkins, Hoover, and Phillips that showed differing interpretations of what "somewhat less" means. Plaintiffs also argue that be-cause there were no calculations to support the projection, there is a fact issue as to whether it was reasonable.

Defendants' statement that income could be "somewhat less than" $257 million is obviously not precise or carefully drafted. However, it is coupled with a discussion of specific relevant factors that could affect the prediction. Before making the statement that management expected income to be "somewhat less" than $257 million, the 1991 first quarter Form 10–Q extensively discussed the specific factors that were affecting operating income, stated that management expected those factors to continue, and provided the actual first quarter operating results. The statement meets the test of the "bespeaks caution" doctrine. *Rubinstein v. Collins,* 20 F.3d at 167.

Plaintiffs argue that the results for January 1990, which were below budget and below January 1989, confirmed that BFI's forecasting was unreliable and its projections unreasonable. However, BFI's first quarter 1991 projection was lower than both the prior year and the 1990 budget. BFI disclosed its opinion of the impact of the recession and reported the decline from the prior year. BFI took into account the factors that plaintiffs point to and made a projection below its budget and below its earlier public projection.

The use of subjective opinions in preparing forecasts does not raise an inference that the conclusions are unreasonable. *Kirby v. Cullinet,* 721 F.Supp. at 1453; *see also In re Software Toolworks,* 789 F.Supp. at 1504 (no inference of *scienter* when the amount of a reserve was a matter of judgment upon which plaintiff and defendant disagreed). There is no disputed fact issue that the challenged statement in defendants' February 13, 1991 Form 10–Q was false or without reasonable basis.

**F. The 1991 Second Quarter Form 10–Q, Dated May 9, 1991**

▆ Plaintiffs allege that the second quarter Form 10–Q, signed on May 9, 1991, also contained materially false information. Plaintiffs allege that BFI had no reasonable

basis for projecting that fiscal 1991 income could be "somewhat below" the prior year, and that the disclosures in the Form 10–Q were intended to mislead investors into believing that BFI's continuing financial difficulties were "due to poor economic conditions in its markets." (Complaint at ¶ 91.)

In an April 17, 1991 press release, BFI announced income from continuing operations for the second quarter (ending March 31, 1990) of $57.3 million. (Docket Entry No. 160, Tab 7). In the second quarter Form 10–Q, filed on May 9, 1991, BFI disclosed that "[i]ncome from continuing operations of the company for the first six months of fiscal year 1991 reflected a decline of 17 percent from the comparable period of the prior year." (Docket Entry No. 160, Tab 8, p. 11).

Once again, the context is important:

> Although revenues increased by 11% for the first six months of fiscal year 1991 as compared to the same period of last year, income from operations for the current six-month period declined by 13% from the prior year. Income from operations was impacted negatively by increases in operating expenses that outpaced the growth in revenues, particularly in North American markets. The collection service and landfill businesses were most affected during this period. In the collection service business, operating expense reductions lagged the decline in revenues experienced in many markets and, therefore, impacted margin performance. In addition, the landfill business is well behind prior year results due to lower volumes, increased costs associated with new airspace construction and higher accruals for closure and post-closure monitoring and maintenance. These increased landfill costs are being accrued pursuant to the more restrictive requirements legislated by many states last year in anticipation of the Subtitle D requirements under RCRA which have not yet been promulgated.

A table laying out profitability ratios similar to the one in the first quarter Form 10–Q followed this paragraph. After the table, the discussion continued:

> Decreases in operating income were experienced in all domestic solid waste businesses with the exception of the medical waste business, which continued to increase despite the slowing economy in many sections of North America. Operating margins declined principally due to (1) reduced volumes at the company's disposal sites and transfer stations as a result of the lower economic growth in the country, state waste minimization requirements and increased recycling, as well as significantly higher landfill operating costs associated with environmental compliance for operation, closure and post-closure activities, (2) increased costs for disposal and fuel in the collection business, (3) increased revenues in the lower margin recycling business area, and (4) substantially increased revenues related to international operations at currently lower profit margins.

> During the second quarter of fiscal 1991, the company's revenue growth and operating income were impacted negatively by the recession which has affected many of its North American markets. Although the impact of the recession has been most severe in the Northeast and along the Atlantic seaboard, most geographical markets have been affected to some degree. Commercial collection operations that depend substantially on a sound economy have suffered more than other areas of the business. Landfill volumes are also below the prior year, largely as a result of the weakened economy. *Because of the uncertainties associated with the length and overall impact of the current economic downturn, the Company is unable to project its operating results for the remainder of the year with certainty. However, based on trends experienced to date, it is management's current belief that income from continuing operations could be somewhat below the $257 million of income reported for the prior year.*

(Docket Entry No. 160, Tab 8, pp. 11–12) (emphasis added).

Plaintiffs argue that the statement that continuing operations income "could be" somewhat below the $257 million reported for the prior year is fraudulent because it was not negative enough. Plaintiffs contend that, "[g]iven the repeated reinforcement of

this number [$257 million], a reasonable investor would have every reason to ignore the purported negative factors disclosed by defendants because, given defendants' statements, they apparently were having no effect on income." (Docket Entry No. 121, pp. 49–50).

Plaintiffs' argument begins by assuming that BFI's statement, "it is management's current belief that income from continuing operations *could be somewhat below* the $257 million of income reported for the prior year," would cause a reasonable investor to ignore the plain meaning of the sentence itself. Plaintiffs next ask the court to assume that a "reasonable investor" would ignore the decline in income from the prior year, and detailed discussions of why operating income was declining, to conclude that the factors causing a decline were actually having no effect on income. "It strains credulity to think that truthful, objective statistics concerning a company's prior performance and revealing a decrease in its growth rate, serve to reinforce what plaintiff[s] characterize as a false image of the company's growth." *Schwartz v. Novo Industri A/S*, 658 F.Supp. 795, 798 (S.D.N.Y.1987).

Plaintiffs claim that the second quarter Form 10–Q created the "misleading" impression that the recession was the only cause of BFI's reduced earnings growth. This claim is not supported in the record. The discussion of the factors affecting operating income includes worsening economic conditions, but also discusses increased costs and the fact that higher revenues were in areas of the company with lower profit margins.

Plaintiffs assert that the second quarter Form 10–Q statement that 1991 income could be somewhat below $257 million was unreasonable because: (1) operating results for the first six months of fiscal 1991 showed that fiscal 1991 would be a "disaster," (Docket Entry No. 121, p. 44, n. 17); and (2) defendants by that point knew that 1991 was a highly unusual year and that the company's projections were therefore not reliable. (*Id.*, p. 49). BFI explicitly disclosed in the Form 10–Q that income from continuing operations for the first six months of fiscal 1991 were 17 percent below the previous year. Plaintiffs

conclusorily assert that this made it unreasonable to project earnings of "somewhat below" $257 million. However, as defendants point out, if this same trend continued throughout the year, fiscal, 1991 income would be 8 percent less than $257 million. BFI also explicitly disclosed that the recession and the uncertainty it created made the year unusual and cast doubt on BFI's projections.

There is no disputed fact issue that the statement issued in May 1991 was false or unreasonable.

### G. The June 27, 1991 Press Release

Plaintiffs allege that BFI's June 27, 1991 press release, announcing a downward revision in its May 1991 projection, was materially misleading. In the press release, the defendants admitted that BFI would not earn $257 million in fiscal 1991. Plaintiffs claim that the statement was misleading because it stated that "[b]ased upon trends experienced to date, management of BFI currently believes that results from continuing operations from the second half of fiscal 1991 will approximate results from the first half of the fiscal year." Plaintiffs contend that the statement could not have been made in good faith, given the company's monthly operating results to date.

The press release stated as follows:

Browning–Ferris Industries, Inc. (NYSE–BFI) today announced that the length and overall impact of the current economic downturn is continuing to affect adversely its business. Based upon trends experienced to date, management of BFI currently believes that results from continuing operations for the second half of fiscal 1991 will approximate results from the first half of the fiscal year. As a result, income from continuing operations for fiscal 1991 will be lower than the $257 million ($1.68 per share) reported for fiscal 1990.

(Docket Entry No. 160, Tab 9).

Defendants had prepared a 1991 Mid–Year Forecast. This was an unusual step, responding to concerns raised by the decline in operating results from the budget and from the prior year. The Forecast contained actu-

al results for the first and second quarters of fiscal year 1991. Actual first quarter net income from continuing operations was $60,-800,000 and actual second quarter net income from continuing operations was $57,300,000. The Forecast projected net income from continuing operations of $59,300,000 for the third quarter, and of $64,900,000 for the fourth quarter, and approximately $242 million for fiscal 1991. (Docket Entry No. 121, Ex. 32, BFI2–05947). This compared to earlier public projections of $257 million for fiscal 1991.

The statement that "based upon trends experienced to date, management of BFI currently believes that results from continuing operations for the second half of fiscal 1991 will *approximate* results from the first half of the fiscal year," was more cautious than BFI's internal Mid–Year Forecast, which predicted net operating income for the second half of the year to be 5 percent higher than net operating income for the first half of the year.

Plaintiffs argue that "[A]t least by the end of the second quarter, BFI could not reasonably rely on historical trends or even the 1991 budget," including the regions' estimates of operating results. (Docket Entry No. 121, p. 20). However, the summary judgment evidence shows that in the Mid–Year Forecast BFI recognized problems with the earlier estimates of operating results from the regions and took those problems into account:

> ... [b]ased on the mid-month projections for May 1991 of $44.7 million, the last four months of fiscal year 1991 will need to average $51.5 million per month. Since the Company has yet to exceed $45.5 million monthly EBIT level during the current year, *the projected Statement of Operations on page 3 was prepared which tempered the regions' forecast by $13.2 million for the final six months.*

(Docket Entry No. 121, Ex. 32, BFI2–05944). The projected operating results for the second half of fiscal 1991 came from the "tempered" numbers on page 3 of the Mid–Year Forecast. The uncontroverted summary judgment evidence shows that defendants did not rely on the unadjusted previous projec-

tions in making the Mid–Year Forecast or the challenged statement.

The record before this court does not create a fact issue that defendants' statements in the June 27, 1991 press release were false or unreasonable when made.

**H. The 1991 Third Quarter Form 10–Q, Dated August 12, 1991**

 The third quarter 1991 Form 10–Q, dated August 12, 1991, stated that "management of the Company believes that results from continuing operations for the fourth quarter of the current fiscal year will approximate results experienced in the current quarter. As a result income from continuing operations for fiscal 1991 will be approximately 10 percent lower than the $257 million ... reported for fiscal 1990." (Docket Entry No. 160, Tab 11, p. 12). Plaintiffs argue that, given the June 1990 operating results that were 28 percent below budget and 20 percent below the prior year, defendants did not have a reasonable basis for the "10 percent below 1990" projection.

The actual third quarter income was approximately 0.6 percent lower than the Mid–Year Forecast for the third quarter. The third quarter Form 10–Q described the reasons for the income decline in the face of a 5 percent increase in revenues and stated management's belief that "income from continuing operations for fiscal 1991 will be approximately 10 percent lower than the $257 million reported for fiscal 1990." The 10 percent below the 1990 income of $257 million was *less* than the year-end projection in BFI's Mid–Year Forecast, adjusted for the variance between actual and projected third quarter 1991 results. The undisputed summary judgment evidence is that BFI did recognize adverse monthly operating results in its Mid–Year Forecast and subsequent public projection. BFI identified the factors that it believed accounted for the decline and would lead to the "10 percent below 1990" year end results. In hindsight, BFI's judgment as to the amount of downward revision required was flawed; the revision was not low enough. This is not enough to raise an inference of fraud. *Kirby v. Cullinet Software,* 721 F.Supp. at 1452–53.

A few weeks later, after the July and mid-August operating results were available, BFI issued a Form 8–K dated August 30, 1991, revising the income projection for the year further downward. In the Form 8–K, BFI stated:

> During the third quarter of fiscal 1991, the company's revenue growth and operating income were impacted negatively by (i) the reduction in commercial waste volumes due to the economic recession which has affected many of its North American markets, (ii) state waste minimization requirements, (iii) and emphasis of many commercial collection customers, as a result of the recession, on controlling and reducing operating costs, which has lead to downward pressure on pricing, and (iv) the increased emphasis on recycling activities which has diverted a portion of the historical waste stream away from the higher margin collection and landfill operations and has been partially offset by increases in the currently lower margin recycling business. Because the factors described above are continuing to effect earnings negatively, management of the Company currently believes that results from continuing operations for the fourth quarter of the 1991 fiscal year will be approximately 15% to 25% less than the results experienced in the third quarter of fiscal 1991.. As a result, management currently believes that income from continuing operations for fiscal 1991 will be approximately 12% to 15% lower than the $257 million ($1.68 per share) reported for fiscal 1990.

(Docket Entry No. 160, Tab 12).

Plaintiffs argue that BFI was reckless in failing to wait until it had the July 1991 results before issuing the third quarter Form 10–Q. The fact that the defendants revised the Form 10–Q estimate in the Form 8–K disclosure does not raise an inference of fraud. *See Borow v. nView Corp.*, 829 F.Supp. at 834–835 (inference of falsity of a projection from the fact that the defendants revised the projection six weeks later amounted to "fraud by hindsight, which is insufficient to state a claim under Rule 10b–5").

A major purpose of the Form 8–K is to allow management to update investors between regularly scheduled filings. "The registrant may, at its option, report under this item any events, with respect to which information is not otherwise called for by this form, that the registrant deems of importance to security holders." Form 8–K, Item 5; Thomas Lee Hazen, 1 *Treatise on The Law of Securities Regulation,* 2d ed, at 394, n. 20. The claim that BFI violated the securities laws by timely filing its regularly scheduled third quarter Form 10–Q, and then using the Form 8–K to inform investors of information that became available after the Form 10–Q was filed, is meritless.

BFI's projection in the Form 8–K, which plaintiffs have not challenged in this case, turned out to be accurate. On November 5, 1991, two months after the second class period ended, BFI issued a press release announcing that income from continuing operations for fiscal 1991 (before special charges) was $222 million. This was 13 percent lower than the $257 million, within the 12 percent–15 percent range that BFI had projected in the Form 8–K. (Docket Entry No. 160, Tab 13).

## VIII. Insider Sales

The chronology of challenged insider sales is as follows:

(1) **February 13, 1991:** first quarter Form 10–Q issued.

(2) February 25, 1991: BFI Vice President Gerald Burger sold 19,500 shares at $27.25.

(3) March 13, 1991: BFI Vice President David Hopkins sold 17,000 shares at $26.75 per share.

(4) March 18, 1991: BFI Vice President Arthur Johnson sold 1,000 shares at $26.88 per share.

(5) March 22, 1991: BFI Vice President Bruce Hendrickson sold 12,561 shares at $25.75 per share.

(6) **April 17, 1991:** Press release issued announcing second quarter results.

(7) April 22, 1991: BFI Director Bruce Ranck sold 20,000 shares at $28.13.

(8) **May 9, 1991:** Second quarter Form 10–Q issued.

(9) May 1991: Mid-Year Forecast.

(10) June 17, 1991: BFI Board member Harry Phillips sold 135,000 shares at $28.00 per share.

(11) **June 27, 1991:** Press release issued projecting that "BFI currently believes that results from continuing operations for the second half of fiscal 1991 will approximate results from the first half of the fiscal year."

(12) **July 19, 1991:** Press release issued announcing third quarter results.

(13) **August 3, 1991:** Third quarter Form 10–Q signed.

(14) August 12, 1991: BFI Vice President Stanton sold 60,000 shares at $27.61 per share. Plaintiffs allege that this represented 49% of his holdings in BFI stock.

(15) August 23, 1991: Hoover sold 15,000 shares of stock at $27.00 per share. Plaintiffs allege that this represented 51% of his holdings in BFI common stock.

(16) **September 3, 1991:** Form 8–K, signed 8/30/91, is filed.

 A private cause of action for insider trading exists under Rule 10(b) for persons who traded contemporaneously with the insider. *In re Worlds of Wonder Securities Litigation*, 35 F.3d at 1427 (*citing Neubronner v. Milken*, 6 F.3d 666, 670 (9th Cir.1993)). Corporate insiders who knowingly use nonpublic information for their own benefit in selling stock may be liable only to uninformed outsiders who trade "contemporaneously" with the insiders. *Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 88, 95 (2d Cir.1981).

The contemporaneous trading requirement must be met "because noncontemporaneous traders do not require the protection of the 'disclose or abstain' rule because they do not suffer the disadvantage of trading with someone who has superior access to information." *Neubronner*, 6 F.3d at 669 (*citing Wilson*, 648 F.2d at 94–95). To extend the time of liability well beyond the time of the insider's trading could make the insider liable to "all the world." *Id.* at 669–670.

 A plaintiff's trade must have occurred *after* the wrongful insider transaction. *See, e.g., In re Equity Funding Corp. of America Securities Lit.*, 416 F.Supp. 161, 183–85 (C.D.Cal.1976); *In re Olympia Brewing Co. Securities Litigation*, 613 F.Supp. 1286, 1298–99 (N.D.Ill.1985); *O'Connor & Associates v. Dean Witter Reynolds, Inc.*, 559 F.Supp. 800, 803 (S.D.N.Y.1983); *see also* Wang, *The "Contemporaneous" Traders Who Can Sue An Inside Trader*, 38 Hastings L.J. 1175, 1178 (1987).

A representative bringing suit on behalf of a class of purchasers must have traded contemporaneously. *Alfus v. Pyramid Technology Corp.*, 745 F.Supp. 1511, 1523 (N.D.Cal. 1990). If a named plaintiff has not traded contemporaneously with the insider, he or she lacks standing to bring a private insider trading claim, and therefore is an inadequate class representative. *Alfus*, 745 F.Supp. at 1523.

The duration of a "contemporaneous" class varies, although some courts have interpreted the "contemporaneous trading" requirement strictly. *Alfus v. Pyramid Technology Corp.*, 745 F.Supp. at 1522. One court has used a loose standard, holding that the time period lasted until the information upon which the insider traded was publicly disseminated. *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, [1975–1976 Transfer Binder] Fed.Sec.L.Rep. (CCH) P 95,377, at 98,877–78, 1975 WL 437 (S.D.N.Y.1975). Other courts have held that a shorter period between the insider sale and a plaintiff's purchase was too long. *Backman v. Polaroid Corp.*, 540 F.Supp. 667, 671 (D.Mass. 1982); *Kreindler v. Sambo's Restaurants, Inc.*, [1981–1982 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 98,312, 1981 WL 1684 (S.D.N.Y.1981).

 Insider trading in suspicious amounts or at suspicious times is probative of bad faith and *scienter*. *In re Apple Securities Litigation*, 886 F.2d at 1117. An inference of *scienter* related to stock sales is a pleading presumption, which can successfully be defeated by evidence that the trades were

innocuous. *Rubinstein,* 20 F.3d at 169 n. 38; *see also In re Apple Computer Sec. Litig.,* 886 F.2d at 1117; *Provenz v. Miller,* No. C–92–20159 RMW, Slip Op. 16–17, 1994 WL 485925, *7 (N.D.Cal. June 27, 1994) (Docket Entry No. 161, Tab 29, p. 16) (granting summary judgment on scienter where the "uncontradicted deposition testimony showing innocent explanations, such [as] a program of periodic divestment and the need to free funds to meet tax liabilities" defeated the inference). At that point, the summary judgment burden shifts back to plaintiffs to provide evidence apart from the stock sales to prove *scienter.*

There is no evidence that Burger's sale and Hopkins' sales were either suspiciously timed or anything but "innocuous." Burger sold in February 1991, shortly after the February 13, 1991 second quarter Form 10–Q had been issued. Hopkins sold on March 13, 1991. Plaintiffs do not allege any specific, undisclosed "insider" information on which either of these individuals relied in making the sales. Both individuals have produced innocuous explanations for the trades.[8] Similarly, there is no summary judgment evidence that Hendricksen's, Johnson's, or Ranck's sales of stock were suspiciously timed, or without innocuous explanation.

The instances of insider selling that may raise an inference of suspicion due to timing are Phillips's, Stanton's and Hoover's. Phillips sold his stock ten days before the June 27, 1991 press release announcing a downward revision in the income projection and after the internal Mid–Year Forecast was issued. Stanton sold on August 12, 1991, just after BFI announced that it projected 1991 income as 10 percent to 12 percent below 1990. Hoover sold on August 23, 1991. Both sales occurred shortly before BFI announced in the Form 8–K that it expected a 12 percent to 15 percent decline from 1990. These defendants have provided summary judgment evidence of personal reasons for the fact and timing of the sales.

There is a threshold problem that must be resolved as to the insider trading allegations. Plaintiffs have not alleged a trade or a class

representative that would meet the contemporaneous time period requirement. *See Neubronner,* 6 F.3d at 670 (contemporaneous trading must be pleaded with particularity under Rule 9(b)). Plaintiffs have not pleaded or provided any proof of one of the required elements for an implied violation of Rule 10(b) through insider trading.

Plaintiffs have not pleaded contemporaneous trading with any of BFI's insiders who sold stock during the second class period; have not identified a class representative who traded contemporaneously; and have provided no evidence of contemporaneous trading for the summary judgment record. This issue was not raised or briefed by the parties, and, despite the age of this case, may be one that the plaintiffs can adequately address by amending their complaint or explaining why it is unnecessary. This court will allow plaintiffs 14 days to address this issue. Defendants will have 10 days thereafter to file a response.

## IX. Aiding and Abetting Liability

 Plaintiffs have asserted that the individual defendants are liable for aiding and abetting. In *Central Bank of Denver v. First Interstate Bank of Denver,* —— U.S. ——, ——, 114 S.Ct. 1439, 1455, 128 L.Ed.2d 119 (1994), the Supreme Court held that "[b]ecause the text of § 10(b) does not prohibit aiding and abetting, we hold that a private plaintiff may not maintain an aiding and abetting suit under § 10(b)." The Supreme Court limited liability to "[a]ny person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies. . . ." *Id.* Therefore, this court grants summary judgment for the individual defendants on the claim of aiding and abetting liability.

## X. Control Person Liability in the First and Second Class Periods

 Plaintiffs also seek secondary liability against the individual defendants as con-

---

**8.** *See* Burger Deposition, pp. 85–86, (stock sale to purchase a home); Hopkins Deposition, pp. 119–

20 (timing of sales dictated by option terms and need to finance children's college education).

trol persons under section 20(a). To establish a *prima facie* case under section 20(a) in the Fifth Circuit, plaintiffs must demonstrate that the individual participated in or induced the alleged primary violation. *Dennis v. General Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir.1990).

This court's ruling on the alleged primary violations disposes of the alleged control person liability claims as well. The court also notes that, with the exception of defendants Ruckelshaus and Thorne–Thomsen, plaintiffs have not pointed to any evidence that the individual defendants participated in or induced the alleged primary violation beyond the mere fact that they were officers or directors of BFI or that they may have signed various public documents. Although reliance on such facts to establish a presumption of participation in the fraud may be sufficient to *plead* a section 20(a) violation or to survive a motion to dismiss, plaintiffs may not rely on a pleading presumption at the summary judgment stage. *In re U.S. Bioscience Sec. Litig.*, 806 F.Supp. 1197, 1202 (E.D.Pa.1992); *Jackson v. First Fed. Sav.*, 709 F.Supp. 863, 878–80 (E.D.Ark.1988).

Absent evidence that the individual defendants participated in or induced the alleged violations, and based on this court's prior rulings, the individual defendants Ruckelshaus, Drury, Stanton, Hopkins, Phillips, and Thorne–Thomsen are entitled to summary judgment on plaintiffs' section 20(a) claim.

**Order**

This court GRANTS defendants' motion for summary judgment as to all alleged federal securities law violations arising out of the first class period.

This court GRANTS defendants' motion for summary judgment as to all alleged federal securities law violations arising out of the second class period with the exception of the insider trading claims against Phillips, Hoover, and Stanton. As to those claims, plaintiffs are allowed 14 days to address the contemporaneous trading requirements. Defendants will have 10 days thereafter to file a response.